LIFE OF THE LAND, INC., a Hawaii non-profit corporation by itself and on behalf of its members, et al., Plaintiffs-Appellants, *v.* CITY COUNCIL OF THE CITY AND COUNTY OF HONOLULU, et al., Defendants-Appellees

and

THE VICTORIA PARTNERSHIP, a Hawaii limited partnership, et al., Defendants-Intervenors-Appellees, and THE FIRST UNITED METHODIST CHURCH, Intervening-Defendant-Appellee

NO. 7240

JANUARY 11, 1980

RICHARDSON, C.J., OGATA AND MENOR, JJ., RETIRED JUSTICE MARUMOTO AND CIRCUIT JUDGE ROBERT WON BAE CHANG, ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY MARUMOTO, J.

This case arose in connection with a project, known as The Admiral Thomas, for the development by The Victoria Partnership and The Admiral Thomas Venture (the Developers), of a parcel of land in Honolulu, owned by the First United Methodist Church, under a development agreement executed by the Church and the Developers on August 22, 1975.

The Victoria Partnership is a Hawaii limited partnership, and The Admiral Thomas Venture is a Hawaii joint venture. The latter is the general partner of the former. In all business dealings, the Developers are represented by Sheridan Ing as their agent.

The case is before us on an appeal by plaintiffs from a judgment of the First Circuit Court dismissing their complaint and from an order of that court denying their motion for relief from the judgment. The circuit court entered its judgment pursuant to its order denying plaintiffs' motion for partial summary judgment and granting the motion of defendants and intervening defendants for summary judgment.[1]

On this appeal, our function is to resolve questions of law applicable to the facts which appear in the record. There is no genuine issue regarding the facts contained in the record. Only questions of law are set forth by plaintiffs, as well as by defendants and intervening defendants, in their statements of questions presented on appeal required by our rules.

The Admiral Thomas project contemplates construction of a highrise building containing residential apartments, and off-street automobile parking stalls, to be sold as condominiums, and a two-story administration and classroom building to be used by the Church, on the project site. There is a sanctuary on the site, which will not be disturbed by the project.

Construction of the two-story building and retention of the sanctuary are not in controversy. Controversy exists only with respect to the construction of the highrise building.

The project site is located on the easterly side of Victoria Street, between Kinau Street and Beretania Street, directly across Honolulu Academy of Arts and catercorner from Thomas Square. It is rectangular in shape, slopes about 11 feet from Kinau Street to Beretania Street, and contains an area of 2.07 acres, or 90,053 square feet.

---

[1] After this appeal was entered on the calendar of this court, plaintiffs filed a motion for stay of all proceedings. This court denied the motion in an opinion reported in *Life of the Land, Inc. v. City Council of the City and County of Honolulu,* 60 Haw. 446, 592 P.2d 26 (1979).

Thomas Square and the Academy are designated for preservation on the State and National registers because of their historical significance.

A map showing the location of the project site, the Academy and Thomas Square, and the location of the contemplated highrise building and the sanctuary, is appended at the end of this opinion as Exhibit I.

Plaintiffs are organizations and individuals interested in the preservation and enhancement of the historical, cultural, and scenic values of the Academy and Thomas Square and opposed to the construction of a highrise building of the nature contemplated in the project in the immediate vicinity of the Academy and Thomas Square. Neither the Academy nor any of its directors or officers is among the plaintiffs who filed the complaint.

In their complaint, plaintiffs named the members of the City Council of the City and County of Honolulu, the Mayor, and the Directors of the Department of Land Utilization (DLU) and the Building Department, as defendants, and sought a judgment declaring the invalidity of the action taken by the City Council on September 21, 1977, as amended on November 10, 1977, with respect to the construction of the buildings contemplated in the project.[2]

The Church and the Developers are parties in this case as intervening defendants by leave of court, obtained over plaintiffs' objection.

At the time the Church and the Developers executed their development agreement on August 22, 1975, and at all subse-

---

[2] DLU and Building Department are departments in the executive branch of the government of the City and County of Honolulu. The former is created under Revised Honolulu Charter (RHC), Article VI, Chapter 10; and the latter is created under RHC, Article VI, Chapter 15.

DLU handles the operational and implementation aspects of city planning, and, to that end, administers the long range plans developed by the Department of General Planning, which is created under RHC, Article V, Chapter 4. *Final Report of the Charter Commission, City and County of Honolulu,* 1971-1972, p. 8.

Building Department has the duty of enforcing housing and building codes as may be provided by law. RHC, Section 6-1503(b).

quent times pertinent to this case, the project site was located within an area zoned as Apartment District A-4, under the Comprehensive Zoning Code (CZC).

That zoning appears in the transition provision of CZC, Article 14, Section 21-1401(c)(3), Item k.

Under such zoning, it is permissible for the Developers to construct on the project site, subject to requirements for yard-spacing and off-street parking facilities for automobiles, a high density multiple-family dwelling 350 feet high and containing total floor area of 309,476 square feet, after deducting the floor area of 9,200 square feet contained in the existing sanctuary and a floor area of 17,313 square feet in the contemplated two-story administration and classroom building.

However, five months after the execution of the development agreement, the City Council enacted, under its general police and homerule powers, Ordinance No. 4551, hereafter referred to as the Kakaako Ordinance, which became effective upon approval by the Mayor on January 23, 1976.

The purpose of the ordinance was to provide a vehicle to control development in the general area referred to therein as the Kakaako area, and to prevent race of diligence by property owners, pending the formulation by the City Council of development policies and plans for the area, which might involve amendments to CZC, amendments to existing General Plan, Detailed Land Use Map (DLUM), and Development Plan, and creation of Special Design District.[3]

The area covered by the ordinance is shown in the Kakaako Interim Development Control Map, a copy of which is appended to this opinion as Exhibit II. The project site is located within the ordinance area.

In order to carry out its purpose, the ordinance prohibited, in section III-A(1) thereof, acceptance of applications for permits for the construction of buildings within certain zoning

---

[3] Existing General Plan, DLUM, and Development Plan are mentioned in RHC, Section 15-106. Special Design District is created under CZC Article 15.

districts, including Apartment District A-4, in the ordinance area, during the interim period.[4]

Also, in order to avoid the imposition of any inequities and undue hardships, the City Council retained, in section IV-A of the ordinance, the power to vary or modify the application of any provision of the ordinance, upon determining, in its legislative discretion, that such variance or modification was consistent with the spirit of the amendments to CZC, General Plan, DLUM, and Development Plan, and with the health, safety, morals, and general welfare of the City and County of Honolulu.

Section IV-B of the ordinance provided for the filing of applications for such variance or modification with the City Clerk, accompanied by support data and justification report, and the referral of such applications by the City Clerk to appropriate department for report and recommendation with respect to the effect of the prospective variance or modification upon the proposed amendments to the General Plan, DLUM, Development Plan, and CZC.

The original expiration date of the ordinance was November 26, 1976, but, after mesne extensions, the expiration date was extended by Ordinance No. 77-113 to June 30, 1979.

The Kakaako Ordinance was repealed and replaced by Ordinance No. 78-64, which will hereafter be referred to as the Revised Kakaako Ordinance, which took effect upon approval by the Mayor on July 12, 1978.

The Revised Kakaako Ordinance embraced an area much smaller than the area covered by the Kakaako Ordinance. The revised ordinance area is shown by dash marks on Exhibit II.

The stated expiration date of the revised ordinance was June 30, 1979, subject to the following provision in section III-A(1):

In the event a Special Design District or Historic, Cul-

---

[4] Applications for building permits are filed in, and accepted by, the Building Department.

tural, Scenic District ordinance shall be enacted prior to the specified date mentioned hereinabove, the area within such Special Design District or Historic, Cultural, Scenic District shall be thereafter excluded from the provisions of this ordinance.

The ordinance did not contain any provision for variance or modification. However, it provided in section III-B(3) thereof, that nothing contained therein should affect:

The granting or issuance and/or approval of building permits in accordance with any approval of variance or modification granted by the City Council under Ordinance No. 4551.

On July 11, 1977, almost two years after the date of the development agreement, and one year and six months after the enactment of the Kakaako Ordinance, the Developers filed their application for variance or modification, as provided in section IV-A of the Kakaako Ordinance.

The time intervals stated in the preceding paragraph are not material, except to negate any contention that the Developers engaged in a race of diligence.

The project for which variance or modification was sought by the Developers included a high density multiple-family dwelling, 206 feet wide on the broad side; 59 feet wide on the narrow side; with a height of 350 feet, plus a mechanical penthouse 20 feet high; containing 177 one-bedroom and two-bedroom units on 35 apartment floors over four levels of off-street automobile parking facilities; set back 95 feet from Victoria Street; with the narrower dimension of the building oriented toward the Punchbowl main lookout platform, as shown on Exhibit I.

At the time the developers filed their application, construction of such building was permissible under CZC, but the Kakaako Ordinance blocked the obtaining of necessary building permit.

The Developers filed their application with the City Clerk, and the City Clerk, in turn, referred it to DLU, as the appropriate department, for report and recommendation to the City Council, all as provided in section IV-B of the Kakaako Ordinance.

In preparing the support data accompanying their application, the Developers followed the guidelines furnished by the City Clerk. Those guidelines were prepared by DLU, and supplied by DLU to the City Clerk, with a covering letter of the Director of DLU, containing the following statement:

The Appeals provision of the interim control ordinance requires they be referred to the appropriate department for review and report to Council within 30 days. Most often these appeals are forwarded to this department. Often the referrals that are made to us lack some essential details required for our review and recommendation. I feel the use of these guidelines by the applicant will help expedite the processing of the appeals by both this department and by the City Council.

The Developers set forth the justification for their application as follows in their letter to the City Clerk:

The proposed plan will not utilize the maximum intensity. Only 71% of the maximum buildable floor area will be used. Similarly more open space than required by ordinance will be provided (approximately 46% more). The plan also provides more than double the recreation space required by the code.[5]

DLU forwarded its report and recommendation, dated August 17, 1977, to the City Council on August 30, 1977. In the report, it stated categorically:

The proposal shown on the submitted preliminary design plans and drawings conforms to all applicable provisions of the Comprehensive Zoning Code.

---

[5] Under CZC, the maximum permissible floor area of the buildings on the project site is 335,989 square feet. The project consisted of buildings containing an aggregate floor area of 234,665 square feet, of which the floor area of the proposed apartment was 208,182, compared to the permissible CZC maximum of 309,476 square feet, after deducting the floor area of 9,200 square feet in the proposed administration and classroom building and the floor area of 17,313 square feet in the existing sanctuary. The living open space provided on the project site was 62,141 square feet, compared to the minimum CZC requirement of 47,837 square feet; and the recreation space provided in the project contained 24,000 square feet, compared to the minimum CZC requirement of 12,676 square feet.

However, it recommended denial of the application principally on the following grounds: that the proposed apartment structure, with its reflective glass tower, would have an adverse visual impact on Thomas Square and the Academy; and that the structure would not meet the height limitation of the proposed ordinance to establish Historic, Cultural and Scenic District No. 5, the Thomas Square/Academy of Arts District (HCS District No. 5 Ordinance).

The visual impact of the proposed apartment on the Academy is shown on Exhibit III appended to this opinion, which is a copy of a drawing showing the Beretania Street elevation of the structure submitted with the application.

The height limitation of the proposed HCS District No. 5 Ordinance, as applied, to the proposed apartment structure, appears on a drawing prepared by DLU, a copy of which is appended to this opinion as Exhibit IV. The drawing shows that, at a setback of 95 feet from Victoria Street, the structure cannot be higher than 121 feet.

In the report, DLU did not address itself to the effect of the prospective variance or modification upon the proposed amendments to the General Plan, DLUM, Development Plan, and CZC, as specified in section IV-B of the ordinance, except insofar as it referred to the proposed HCS District No. 5 Ordinance.

The proposed HCS District No. 5 Ordinance was developed by DLU, pursuant to CZC, Section 21-1202(A)(2). DLU forwarded Draft No. 1 of the proposed ordinance to the Planning Commission in February 1976, for review and transmittal, with recommendation, to the City Council, pursuant to CZC, Section 21-1202(b).[6]

The Planning Commission held a public hearing on the proposed ordinance on February 18, 1976, at which it received written evidence and heard oral testimony. There-

---

[6] Planning Commission is a commission of nine members, established in RHC, Section 5-405, as a part of the Department of General Planning, to advise the Mayor, City Council, and Chief Planning Officer. Chief Planning Officer is the administrative head of the Department of General Planning under RHC, Section 5-401.

after, on April 27, 1976, it submitted its report to the City Council, recommending rejection of the proposed ordinance for the following reasons, among others:

(a) there were adequate existing governmental controls to insure the preservation of the Academy and Thomas Square;

(b) the impact of high rise structures upon the internal courts of the Academy was not sufficient to deprive surrounding property owners of reasonable density and height then allowed under CZC;

(c) the proposed ordinance envisioned a new land use policy for the area that was not consistent with the existing General Plan, DLUM, and CZC;

(d) if a new land use policy were required, it should be addressed when a new development plan should be prepared for the area.

After receiving the report and recommendation of the Commission, the City Council held a public hearing on June 9, 1976. It then referred the matter to its Planning and Zoning Committee (PZC) subcommittee on Kakaako, which had formed a task force to review the proposed ordinance.

On July 16, 1976, the PZC subcommittee on Kakaako unanimously recommended that DLU prepare alternative restrictions other than height restrictions in the proposed ordinance for its review and consideration. That was followed by PZC Committee Report No. 1933, dated December 7, 1976, requesting DLU to develop other alternatives for the regulation of the district.

The record is blank on any action taken by DLU on the request contained in PZC Committee Report No. 1933.

On August 30, 1977, the same day it forwarded its report and recommendation on the Developers' application to the City Council, DLU submitted to the City Council Draft No. 2 of the proposed HCS District No. 5 Ordinance. That draft did not contain any modification of the height limitation applicable to the project site.

The record shows that PZC scheduled a hearing on Draft No. 2 of the proposed ordinance on September 14, 1976, but it

contains no information regarding the details of the hearing held on that day.

In any event, PZC held a meeting on September 7, 1977, at which it reviewed the DLU report and recommendation on the Developers' application, heard the Developers' response thereto and other testimony, and referred the matter to the Office of Council Services (OCS) for further evaluation and report back to the Committee on September 14, 1977.[7]

OCS, after analyzing the Developers' application, addressed itself to the effect of the prospective variance or modification upon the proposed amendments to the General Plan, DLUM, Development Plan, and CZC, as specified in section IV-B of the Kakaako Ordinance, and concluded that the application complied with the intent of the 1977 amendment to the General Plan, which was to:

(a) protect Oahu's scenic views, especially those seen from highly developed and heavily travelled areas;

(b) encourage residential development near employment centers;

(c) encourage residential development in areas where existing roads, utilities, and other community facilities are not used to capacity; and

(d) require the consideration of urban design principles in all development projects;

and with all other applicable laws, rules and regulations.

In its findings, OCS stated:

(a) DLU referred to isolated views of the proposed apartment building from specific points, rather than from highly developed and heavily travelled areas;

(b) the proposed building would be out of the Punchbowl/Diamond Head view corridor, and, viewed from Punchbowl lookout area, it would be seen at its narrowest

---

[7] OCS is an office authorized in RHC, Section 3-108, paragraph 7, which reads:
The council may establish an office of council services and create such positions therein as it deems necessary to assist it in the exercise of its legislative power.
The office is intended to provide staff support to subject areas within the jurisdiction of the City Council. *Final Report of the Charter Commission, City and County of Honolulu,* 1971-1972, p. 13.

width and would be approximately 80 feet below horizon line;

(c) the building would be visible from the courtyard of the Academy, as are some of the other highrises in the vicinity, but, if executed tastefully in color, texture, and general architectural treatment, it might provide an unobtrusive backdrop for the intimate environment of the Academy's courtyard;[8]

(d) development of highrise structures in the vicinity of lowrise historic or architecturally significant buildings had been successfully tried in New York, Boston, and Philadelphia.

Based on those findings, OCS recommended approval of the Defendant's application with the following conditions;

(1) The applicant shall modify the drawings as necessary to substitute other nonreflective and unobtrusive tinted glass, color and texture for the exterior finish of the building. The intent is to make the building as much as possible visually unobtrusive as seen from the Academy of Arts courtyard as well as from other highly developed and heavily travelled areas of Oahu.

(2) Prior to the issuance of the building permit, all final drawings and plans specifying the size, spacing, type and identification of the proposed plant material and trees, samples and specifications of exterior colors, textures and finishes shall be submitted for review and approval by the Director of Land Utilization.

(3) Prior to the issuance of the Certificate of Occupancy, all approved landscaping and planting requirements shall be implemented and completed by the applicant.

Following its meeting on September 14, 1977, PZC recommended that the DLU report and recommendation on the Developers' application, the OCS report and recommendation thereon, and the communication from The Outdoor Cir-

---

[8] The highrises in the vicinity, which are visible from the courtyard of the Academy, are shown on Exhibit III.

cle supporting DLU, be reported out to the City Council for appropriate action on September 21, 1977.

At its meeting on September 21, 1977, the City Council approved the Developers.' application, with the three conditions mentioned in the OCS report and recommendation. Voting for approval were: City Councilmen Kaapu, Koga, Holck, Matsumoto, and Pacarro; for disapproval were Chairman Bornhorst and City Councilmen Akahane and Clement. City Councilman Loo was excused from voting.

The action of the City Council generated considerable community criticism, including editorials in the Honolulu Advertiser and the Honolulu Star-Bulletin.

The criticism centered on the bulk and height of the proposed apartment building, characterized by some opponents of the project as "the massive highrise monster towering over the historic Academy and Thomas Square."

In the light of such criticism, City Councilman Kaapu spearheaded the formation of an ad hoc committee chaired by Rev. Olin Pendleton, former chairman of the Council of Presidents. Among the members of the committee, besides City Councilman Kaapu and Rev. Pendleton, were Cyril Phillips, chairman of the permanent development committee of the church; Sheridan Ing, representing the Developers; Duane Preble, a trustee of the Academy; Don Hanson, current chairman of the Council of Presidents; and Robin Loomis, a member of the Council of Presidents.

It was the understanding of Rev. Pendleton that the committee was designed to resolve the Admiral Thomas controversy. To that end, he called several meetings, among which was a meeting held on the evening of October 12, 1977, at the City Council chambers of the City Hall attended by a crowd overflowing into the outside corridor.

In attendance at the meeting was Paul Lynch, an attorney representing the Academy. He characterized the meeting as an informal public meeting called in order that the public might air its complaints against, or in support of, the proposed Admiral Thomas highrise condominium. He testified that the City Council action in approving the project was highly irregular and probably unlawful.

Also in attendance was Dennis Callan, a director and staff member of Life of the Land, Inc. He spoke against the City Council action, both personally and as a representative of that organization.

On November 3, 1977, the Developers, through Sheridan Ing, offered the following changes in the proposed apartment building, subject to approval of the Church:

(a) decrease the height of the building from the maximum of 350 feet, permissible under CZC, to an average of 299 feet, with a staggered roofline 288 feet high on the Academy side and the elevated portion to be on the side farthest away from the Academy and Thomas Square;

(b) maintain a setback of 95 feet from the property line on the Academy side, compared to the CZC setback requirement of 20 feet, with the setback area landscaped in an attractive manner as open space, not available for automobile parking, to blend with the parklike environment of the immediate area;

(c) decrease the number of apartment units in the building to approximately 150 units from the proposed 177 units; and

(d) decrease the bulk of the building 46 percent from its original design.

With the approval of the Church, the Developers forwarded their offer to the City Council, which placed the same, together with a draft of Resolution No. 512, on the agenda of the November 10, 1977, meeting of the Committee of the Whole chaired by Kaapu.

The Developers' offer was discussed in the Committee of the Whole in the form of a proposed committee report, which stated that the City Council action of September 21, 1977, be amended to provide a building of not more than an average height of 299 feet, a density of approximately 150 units, and a setback of 95 feet from Victoria Street, with the three conditions in the September 21, 1977, action to remain unchanged.

Item (d) in the Developers' offer was not specifically included in the proposed amendment, presumably because it

404

was a meaningless repetition of item (c), in that a decrease from the original design of 275 units to approximately 150 units would be a reduction of 46 percent in bulk.

In the draft of Resolution No. 512, the City Council "respectfully directed" the Developers and the Church to work with the Academy and other affected parties to effectuate the options set forth in the following language:

(1) *Consolidated Development*, hereinafter referred to as the *Preferred Option* shall involve the use of land adjacent to the Admiral Thomas project site at Kinau and Victoria Streets, re-siting the project building further away from Victoria Street. The provision of parking for the Academy of Arts shall be the subject of mutual negotiation between the Academy, the First Methodist Church, and developers Ing and Stark. Conditioned on the availability of funds, the City and County of Honolulu shall undertake the condemnation of adjoining land parcels with the view of providing a site for the Honolulu Theater for Youth, a function presently under the administrative control of the City and County of Honolulu.

(2) Consolidation and use of all available parcels shall permit the study and selection of an alternative in which two residential buildings rather than one may be constructed either at one site or at separate locations.

(3) Any urban design policy which may emerge for the Thomas Square area shall be considered in the design of the project if this may be done without loss to the interested parties.

(4) An additional alternative shall be that compromise which emerged as a result of discussions between the Academy of Arts, the First Methodist Church, and the developers Ing and Stark in the late 1974 and early 1975, and which was described in communications with the Mayor and Council and which is further described in the attached editorial of the Honolulu Advertiser dated March 7, 1975.

Option (1) of the proposed resolution, referred to as the preferred option, envisioned, in the first and second sen-

tences, the consolidation of the project site with three adjoining parcels of land shown on Exhibit I as Tax Map Key (TMK) parcels 2-4-13-9, 2-4-13-10, and 2-4-13-75; re-siting of the proposed apartment building further away from Victoria Street; and providing automobile parking for the Academy necessitated by the use of TMK parcel 2-4-13-75 for re-siting of the apartment building. The third sentence of Option (1) dealt with a plan under contemplation by the City Council to find a home for the Honolulu Theatre for Youth, an activity under the administrative control of the City and County of Honolulu, by doing the following:

(a) abandon the portion of Victoria Street between Kinau Street and Victoria Street;.

(b) acquire by condemnation TMK parcels 2-4-13-9, 2-4-13-10, and 2-4-13-75, for public use, namely, for the use of the Honolulu Theatre for Youth;

(c) after condemnation, exchange the three parcels mentioned in (b) for a portion of the project site adjoining Victoria Street; and

(d) construct the Honolulu Theatre for Youth and its facilities on the abandoned portion of Victoria Street and the exchanged portion of the project site.

Option (2) addressed itself to Hanson's suggestion that two apartment buildings, each 80 feet high, be constructed on one site or on two separate locations. Hanson's suggestion mentioned only the height, and not the bulk, of the buildings which he had in mind.

Option (3) related to the proposed HCS District No. 5 Ordinance, which had been pending in the City Council for more than one year and six months since April 27, 1976, when the Planning Commission submitted its report and recommendation thereon to the Council.

Option (4) had reference to an early study made by the Developers of the feasibility of an apartment building on the project site, 266 feet high, with a setback of 50 feet from Victoria Street.

City Councilman Kaapu, as chairman of the Committee of the Whole, opened the committee meeting with the following statement:

Let me explain, you have a resolution before you and there is also a requirement for a committee report with certain information which I will read off later in it. And the reason for that is, there are essentially two types of actions required. One is the setting forth of options and the other is to limit the potential development further than that which we had done previously by our actions.

Present in the committee room, besides the members of the City Council, were Ing, Preble, Hanson and Callan.

The discussion in the committee was extensive and incisive. Under the committee rules, only committee members may participate in the discussion of the items on the agenda. However, Ing, Preble, Hanson and Callan were invited to speak. Not only were they invited to speak, the Committee took a short recess to enable them to acquaint themselves with the contents of the proposed resolution and the proposed committee report.

At the conclusion of the discussion, the committee voted to report out the proposed resolution and the proposed committee report for action on the floor. In reporting out the proposed committee report, the same was designated Committee Report No. 174.

In the City Council meeting which ensued, Resolution No. 512 was adopted first, with eight votes in the affirmative and one vote in the negative. Voting in the affirmative were Chairman Bornhorst and City Councilmen Akahane, Holck, Kaapu, Koga, Loo, Matsumoto, and Pacarro. City Councilman Clement cast the sole negative vote. In doing so, he stated:

I can't support the resolution. . . . I firmly believe that the entire matter should have been reconsidered on the original motion, and we either accept or deny that on that basis. I think a compromise accepts something that will set the tone and the direction for the development and design in that district and I can't, I can't accept that.

Following its action on Resolution No. 512, the City Council adopted Committee Report No. 174, with the Council reserving jurisdiction in the matter. The voting on the adoption of the committee report was the same as on Resolution No. 512, eight in the affirmative and one in the negative, with City Councilman Clement casting the sole negative vote.

Thereafter, City Councilman Kaapu introduced in the City Council four draft resolutions, one of which provided for abandonment of the portion of Victoria Street between Kinau Street and Beretania Street, and the other three provided for acquisition of TMK parcels 2-4-13-9, 2-4-13-10, and 2-4-13-75 by eminent domain.

Those draft resolutions were introduced in furtherance of the purpose stated in the third sentence of Option (1) of Resolution No. 512. By Committee of the Whole Report No. 3, dated January 11, 1978, they were referred to DLU for completion and comment. DLU responded to the referral by Departmental Communication No. 206, which stated that any action pursuant to those resolutions would be questionable without amending the Development Plan and DLUM.

On January 24, 1978, the Developers submitted to the Building Department their application for building permit, together with revised plans prepared in the light of the City Council action of November 10, 1977, on Committee Report No. 174.

The Building Department forwarded the application to DLU pursuant to the provision in the City Council action of November 10, 1977, that all final drawings and plans be submitted to the Director of DLU for review and approval before the issuance of building permit.

On January 25, 1978, the day after the Developers submitted their application for building permit, the City Council held a public hearing on Draft No. 3 of Bill No. 45 (1976), the latest draft of the proposed HCS District No. 5 Ordinance.

Discussion at the hearing was premised on an understanding on the part of all members of the City Council that Admiral Thomas was not affected by the proposed ordinance. That understanding was based on an oral opinion rendered by Deputy Corporation Counsel Nakamoto at the Committee of

the Whole meeting held on January 11, 1978.[9] Chairman Bornhorst did not personally agree with the opinion, but the following statement she made, when City Councilman Kaapu was trying to delve into the status of the negotiation among affected parties under Resolution No. 512, shows that she deemed herself bound by that opinion:

> Mr. Kaapu, Corporation Counsel has ruled although I personally don't agree with them, that this will not be affected by this particular ordinance. Could we keep questions relating to the rights and wrongs of this ordinance please?[10]

The rules of the hearing provided that only those who had signed up to testify would be heard. The Academy had no person signed up to testify on its behalf. However, Treble was present at the hearing, presumably as an observer. Callan had signed up to testify, and read his written testimony, which contained the following statement:

> One of the most important issues here is the obtrusive Admiral Thomas, which has been subjected to much discussion, all of which showed the public is opposed to such a large building in the area. A recent confusing Council action on Admiral Thomas left things very much up in the air.
>
> Life of the Land suggests that this confusion be dispelled by making sure that this proposed ordinance #45 apply to the Admiral Thomas site as well as the surrounding area. One way to do this is to refer, not specifically to Admiral Thomas, but to any building which does not yet have building permit as being directly affected by this ordinance.

---

[9] Under RHC, Section 5-203, corporation counsel serves as the chief legal adviser and legal representative of all agencies, the Council, and all officers and employees, in matters relating to their official powers and duties.

[10] Also, in her answers filed on August 2, 1978, to interrogatories propounded by plaintiffs' attorney, Chairman Bornhorst answered "no", to the following question: "Did you at any time believe that Ordinance No. 78-18 (The Thomas Square/Academy of Arts Historic, Cultural and Scenic District Ordinance) applied to the action referred in Question (1), supra?" The action referred to was the City Council action of September 21, 1977, on the Admiral Thomas project.

After reading his written testimony, Callan engaged in the following colloquy with City Councilman Kaapu:

Kaapu: Dennis, that last portion about the building permits and so forth would that take care of the thing that was brought up by Corporation Counsel on, said that this ordinance would not affect the Admiral Thomas. Would that type of language handle that situation?

Callan: In my opinion it would but I'm not a lawyer.

Kaapu: No, no, I'm wondering if your recommendation was to take care of that.

Callan: Yeah, right, that's specifically why we suggest that you put those words right into the ordinance so that it applies to all construction.

Kaapu: We check that out and see . . . .

On February 8, 1978, the Committee of the Whole, in Committee Report No. 37, mentioned among other matters:

(a) Draft No. 3 of Bill No. 45 (1976), the proposed HCS District No. 5 Ordinance;

(b) Departmental Communication No. 206, containing the response of the Director of DLU to the referral of the four draft resolutions in Committee Report No. 3;

(c) Miscellaneous Communication No. 86, containing Callan's written testimony at the public hearing; and

(d) Council Communication No. 72, containing the thoughts of City Councilman Akahane on Bill No. 45 in terms of building heights, setbacks, landscaping, and architectural appearance,

and recommended as follows:

(a) that the four draft resolutions be received and filed for the reason stated in Departmental Communication No. 206;

(b) that draft No. 3 of Bill No. 45 be amended to incorporate the recommendations contained in Council Communication No. 72 and discussion in the Committee;[11]

---

[11] Council Communication No. 72 and discussion in the Committee are not in the record.

(c) that Draft No. 4 of Bill No. 45 be reported out of the Committee for consideration of passage on third reading by the Council; and

(d) that the communications noted in the report be received and filed.

On February 3, 1978, nine days after the public hearing, City Councilman Kaapu requested Deputy Corporation Counsel Nakamoto to reduce his oral opinion of January 11, 1978, to writing. Nakamoto responded to the request by submitting to Kaapu a written opinion, approved by Corporation Counsel Chung, dated March 29, 1978.

Draft No. 4 of Bill No. 45 (1976) was passed by the City Council, as recommended in Committee Report No. 37, and became effective as Ordinance No. 78-18, upon the approval of the Mayor on February 22, 1978.

Ordinance No. 78-18 does not specifically exempt Admiral Thomas from its provisions. Nor does it contain the provision suggested by Callan in his written testimony at the public hearing. However, there is in Section 6 a provision reading as follows:

*Use Regulations.* In addition to the regulations set forth by this Ordinance, the underlying regulations of the zoning district shall continue to remain applicable; provided that if any conflict occurs, the more restrictive provisions shall apply.

That provision is not a special provision incorporated in that ordinance, but one which reiterates the provision in CZC, Section 21-1206, applicable to all historical, cultural, and scenic district ordinances.

On February 28, 1978, DLU wrote to the Developers' architects inquiring about the status of activities under Resolution No. 512, and stating that the information might be relevant to the review and evaluation of the project by the department.

At that time, the situation with regard to Resolution No. 512 was as stated below.

Option (1) first sentence:

(a) TMK parcel 2-4-13-10, which abuts on a portion of

the easterly boundary of the project site, is owned by James Doo and his wife Olive Doo. The owners have their home there. They had no intention of parting with the possession of the parcel, by sale, lease, or otherwise.

(b) TMK parcel 2-4-13-9 abuts on the easterly boundary of TMK parcel 2-4-13-10, and a small portion of the easterly boundary of TMK parcel 2-4-13-75. It does not abut on any portion of the project site. The parcel had been owned by the Academy, but was sold by the Academy to the operators of Burger King. Unless TMK parcel 2-4-13-10 were consolidated with the project site, it could not have been a part of a meaningful consolidation with the project site.

(c) The facts stated in (a) and (b) above made any negotiation for purchase or lease of TMK parcels 2-4-13-9 and 2-4-13-10 with a view to consolidation with the project site an exercise in futility.

(d) TMK parcel 2-4-13-75 is owned by the Academy. All of its westerly boundary abuts on a portion of the easterly boundary of the project site. So, it could have been consolidated with the project site. The parcel was purchased by the Academy for approximately $500,000 about the time of adoption of Resolution No. 512, with a view to development for its own use. There was some discussion between the Developers and the Church on one side and the Academy on the other, soon after the adoption of the resolution, to make the parcel available for re-siting the proposed apartment building, but the parties were too far apart. In the record, there is a statement by Preble that the Church offered $1.00 per year for an air right over the parcel. In that connection, the following colloquy took place between City Councilman Kaapu and Treble:

Kaapu: Let's forget the dollar a year, that's one technique. Would the academy still be interested at this point in having that piece of land be available if the use to which you were to put it, could be accommodated in another way?

Treble: Well, the simplest way to say it is we have a substantial investment in that piece of land which is about a half a million dollars. And we cannot afford to simply give it up, we'd have to do a trade and when we started talking about a trade it became a dead issue because it seemed impossible from the point of view of the church.

Phillips' version on the negotiation was as follows:

We looked at all angles . . . immediately after that resolution was passed in some depth. We made one specific proposal to the art academy that would have allowed us to shift the building and perhaps it was the only one that we felt was feasible and that the church and the academy could perhaps live with it. Within a matter of days they came back and said that it was impossible from their point of view for a couple of reasons. One, they did not have the money in order to carry out certain things that would need to be done on their part and secondly, they had plans to go up three or four stories with future structures in an area where we were asking for the air rights. And so their plans and our plans just don't seem to fit together at all.

With regard to the proposal to lease air rights, Phillips stated:

[W]e made a proposal to the art academy back in November, . . . in effect leasing their air rights over a piece of property for a very low rate like a dollar a year. That would allow us to move the building without having to actually change ownership of any parcel of land. The reason we wanted to do that was because any exchange of land had to go through this long drawn out process and a great difficulty trying to get approval by people in New York and perhaps in other places, in California all the way up to them.

The last sentence referred to Phillips' earlier statement that an exchange would probably require the approval of a layer of bureaucrats, all the way to the world headquarters of the Church in New York.

Option (1), second sentence:
With regard to the negotiation mentioned in this sentence, Phillips stated that the Church suggested that underground parking be constructed on the parcel, but the Academy was not interested in the suggestion.

Option (1), third sentence:
This matter has already been discussed in the earlier part of this opinion.

Option (2):
The Developers and the Church had not given consideration to this option because they deemed it was premised on the availability of all three parcels for consolidation with the project site.

Option (3):
The Developers and the Church did not consider the proposed HCS District No. 5 Ordinance in the design of the project because that could not be done without loss to themselves.

Option (4):
The Developers deemed that their latest plan was better than the plan which emerged from their earlier study involving the construction of an apartment building 266 feet high, with a setback of 50 feet from Victoria Street, in that the additional setback would provide a better separation between Admiral Thomas and the Academy, and attractive landscaping would preserve a view corridor on Victoria Street.

Ing answered the DLU inquiry of February 28, 1978, addressed to the Developers' architects, by his letter to the Director of DLU, dated March 9, 1978, in which he explained the situation outlined above.

On April 20, 1978, DLU forwarded to the City Council its report on the revised plans accompanying the Developers' application for building permit, which had been submitted to the Building Department on January 24, 1978.

In the report, DLU stated that the plans complied with the density and setback requirements of the City Council action

of November 10, 1977, on Committee Report No. 174, but not with the height requirement, in that the average height of the proposed apartment building, measured from the existing ground elevation along Kinau Street, excluding the mechanical penthouse, was approximately 305 feet 5 inches, instead of the average height of 299 feet specified by the City Council.

Also, in the report, DLU disapproved the proposed landscape plan, and the proposed colors, texture, and architectural treatment of the exterior of the proposed building. Landscape plan was disapproved on the ground that the proposed trees, consisting of a variety of palm trees and small golden shower trees, would be totally inappropriate for the street setback areas and not compatible with the existing landscape character established by the Academy and Thomas Square. The ground for disapproval of the colors, texture, and architectural treatment of the exterior of the building was that they would not satisfy the intent stated in Committee Report No. 174 "to make the building as much as possible visually unobtrusive as seen from the Academy courtyard, as well as from the highly developed and heavily travelled areas of Oahu''.

The Developers spent for design and planning the sum of $84,909.89 between September 21, 1977, and November 10, 1977, and an additional sum of $275,719.23 between November 10, 1977, and April 20, 1978, or the total sum of $360,629.12 between September 21, 1977, and April 20, 1978.

Plaintiffs filed their complaint in this case on May 2, 1978. The following events, which are relevant to the case, occurred after the filing:

*May 9, 1978.* Ing wrote a letter to DLU in response to its report of April 20, 1978, to the City Council. In the letter, he pointed out that the proposed apartment building was within the average height limitation of 299 feet under the method provided in CZC for calculating building heights, which measures height to the top of roof elevation and excludes roof parapet from the measurement, and he also offered, on behalf of the Developers, to make any changes required to meet the department's

concerns about the exterior finish of the building and landscaping.

*May 17, 1978.* The City Council adopted PZC Committee Report No. 971, recommending deferral of any action on DLU report of April 20, 1978, pending receipt of DLU report on Ing's letter of May 9, 1978. Voting in the affirmative were Chairman Bornhorst and City Councilmen Clement, Loo, Matsumoto, and Pacarro, with City Councilmen Akahane, Holck, Kaapu, and Koga abstaining.

*June 16, 1978.* DLU responded to Committee Report No. 971, stating:

Subsequent to transmittal of our report to the City Council, revised building elevations, landscape plan and exterior color scheme; and a scale model of the project were submitted by the applicant as response to the concerns and comments of our report.

With the exception of the color specified for the mullions of the glass curtain wall facades and the two projecting, semi-hexagonal, bulkhead shaped elements located on the upper floors on the makai elevations, revised plans and related documents answers our concerns enumerated in our report of April 20, 1978 and comply with the three outstanding conditions of City Council's Committee Report No. 174 dated November 10, 1977.

Window mullions should be bronze anodized to further reduce color contrast and complement the revised color scheme proposed for the building. Removal of the two cantilevered bulkhead projections at the upper (penthouse) floors on the makai facade would reinforce the vertical expression of the building and de-emphasize its apparent bulk. We feel that these two revisions to building plans relating to exterior color and architectural treatment are warranted and would be consistent with City Council's conditions for approval.

*July 12, 1978.* The City Council enacted Ordinance No. 78-64, the Revised Kakaako ordinance which became effective upon the approval of the Mayor on July 12, 1978. This ordinance is referred to earlier in this opinion.

*October 25, 1978.* The City Council adopted PZC Committee Report No. 2074 recommending that the application for the Admiral Thomas project be reported out to the Council for favorable action in consideration of:

Communication from Sheridan Ing, requesting favorable consideration on the Admiral Thomas project so that they can secure the building permit and proceed with construction; and

Verbal opinion of Deputy City Counsel Nakamoto that the City Council can exercise its discretion concerning compliance of the conditions contained in Committee of the Whole Report No. 174.

The voting on the adoption of the committee report was seven votes in the affirmative, with Chairman Bornhorst and City Councilman Clement casting negative votes.

In addition to the facts stated above, the fact that City Councilman Pacarro voted on all City Council actions on the Admiral Thomas project, without disclosing to the other members of the City Council that his reelection campaign committee had received a check in the sum of $400.00 from Stark Ventures, Ltd., is relevant to an issue raised by plaintiffs on this appeal. The check was dated June 22, 1977, and was deposited in the committee's account at American Security Bank on July 8, 1977. The check was issued for tickets to a testimonial dinner for Pacarro. Bruce Stark, who signed the check, is associated with Ing in the Admiral Thomas project.

We have recited the facts of this case in considerable detail because our decision will depend to a large extent on a review of facts, the factual representations of the parties are inadequate for our purpose, and, in numerous instances, plaintiffs' representations in their briefs are far from factual.

Having stated the facts, we turn to a consideration of the issues before us on this appeal, which are:

I. Validity of the City Council approval of the Developers' application for variance or modification under the principle of checks and balances applicable to the legislative branch and the executive branch of the government of the City and County of Honolulu;

II. Validity of the City Council approval of the Developers' application under the principle of separation of powers;

III. Validity of the manner in which the City Council approved the Developers' application;

IV. Effective date of the City Council approval of the Developers' application;

V. Effect of the enactment of Ordinance No. 78-18, the HCS District No. 5 Ordinance, on the City Council approval of the Developers' application;

VI. Effect of City Councilman Pacarro's participation in the City Council approval of the Developers' application on the validity of the approval; and

VII. Applicability of the doctrine of equitable estoppel on the City Council approval of the Developers' application.

Preliminarily, we preface our consideration of the first three issues by reviewing the program of interim control of land development pending the formulation of updated development policies and plans, which has been in effect, not only in the City and County of Honolulu, but also in municipalities of mainland United States, for many years.

The Kakaako Ordinance was a part of such program. The program is carried out by the enactment and operation of interim development control ordinances similar to the Kakaako Ordinance, which will be referred to, hereafter in this opinion, as IDC ordinances.

We think that such review will place the Kakaako Ordinance in proper perspective because, in the presentation of their case in the circuit court and in this court, plaintiffs

treated the Kakaako Ordinance as *sui generis*, the only ordinance of its kind, and the approval of the Developers' application for variance and modification as the only approval given by the City Council under section IV-A of that ordinance.

A prototype of the Kakaako Ordinance is found in the interim development control ordinance of the town of Ramapo, New York, which is described in *Rubin v. McAlevey*, 282 N.Y.S.2d 564, 566-67 (1967), as follows:

On June 2, 1966 by Local Law #2 the defendant Town enacted an Interim Development Law, the effect of which was to freeze all improvements in those areas of the Town whose zoning classification would be changed if the recommendations of the Master Plan were adopted. In area this constituted some 75% of the Town. This local law prohibited the issuance of any building permits within the areas where changes were contemplated for a period of 90 days. Subsequent local laws (Local Laws #4 and #6 of 1966) extended this moratorium for first 30 days and then until the effective date of the 1966 comprehensive amendment to the zoning law. The Interim Development Law provided that the Town Board shall have the power to vary or modify the application of any of its provisions upon the Board's determination in its absolute legislative discretion that such variance or modification is consistent with the spirit of the comprehensive master plan adopted on July 26, 1966 and with the health, safety, morals and general welfare of the Town. The law provided that upon receipt of any such application, the Town Board should refer the same to the Planning Board for a report with respect to the effect of the prospective variance or modification upon the master plan.

The Kakaako Ordinance was not the only IDC ordinance enacted by the City Council of the City and County of Honolulu. Nor was it the first. The 1978 CZC Cumulative Supplement, published pursuant to HRS § 46-2.2, and covering the period January 1, 1970, through December 31, 1977, shows the following:

(a) Ordinance No. 4362, the Waikiki Ordinance, which took effect on September 25, 1974, eight years after

the IDC ordinance of the town of Ramapo, was the first IDC ordinance in the City and County of Honolulu;

(b) during the period covered in the supplement, the City Council enacted 10 more IDC ordinances, including the Kakaako Ordinance, and 14 ordinances extending the expiration dates of the existing IDC ordinances; .

(c) the Kakaako Ordinance, which took effect on January 23, 1976, was the fourth IDC ordinance in the order of enactment; and

(d) among the ordinances which extended the expiration dates of the IDC ordinances, four ordinances extended the expiration date of the Waikiki Ordinance and three ordinances extended the expiration date of the Kakaako Ordinance.

A list of IDC ordinances, and the ordinances which extended the expiration dates of the IDC ordinances, mentioned in the supplement, is appended to this opinion as Exhibit V.

Among the ordinances listed in Exhibit V, only Ordinance No. 4551, the Kakaako Ordinance, and Ordinance No. 77-113, which extended the expiration date of that ordinance, are in the appeal record.

However, we take judicial notice of all ordinances listed in Exhibit V, and the contents thereof.

Certified copies of all of those ordinances are on file in the office of the Chief Clerk of the First Circuit Court. The First Circuit Court, which was the trial court in this case, could have taken judicial notice of those ordinances, and their contents, under HRS § 622-13(b).[12]

Authorities are in conflict whether an appellate court may take judicial notice of municipal ordinances, not in the appeal record, which the trial court could have judicially noticed. We think that the authorities which permit appellate courts to

---

[12] HRS § 622-13(b) provides:

A certified copy or copies of an ordinance or ordinances of any county may be filed by the clerk of the county with any court and thereafter the court may take judicial notice of the ordinance or ordinances and the contents thereof in any cause, without requiring a certified copy or copies to be filed or introduced as exhibits in such cause.

take judicial notice of such ordinances are more consonant with reason. *Greif v. Dullea*, 66 Cal. App.2d 986, 153 P.2d 581 (1944); *Orose v. Hodge Drive-It-Yourself Co.*, 132 Ohio St. 607, 9 N.E.2d 671 (1937).

According to our examination of the ordinances listed in Exhibit V, the Mayor neither approved nor disapproved the Waikiki Ordinance, and permitted it to take effect pursuant to RHC, section 3-203; the Mayor approved all other ordinances, including the Kakaako Ordinance, the four ordinances which extended the expiration date of the Waikiki Ordinance, and the three ordinances which extended the expiration date of the Kakaako Ordinance; and all IDC ordinances in the list contained a provision for variance or modification identical with, or equivalent to, section IV-A of the Kakaako Ordinance.[13]

It may also be stated that the Developers' application for variance or modification was not the only application which was approved by the City Council under Section IV-A of the Kakaako Ordinance.

There is in the appeal record an exhibit, certified by the Clerk of the City and County of Honolulu containing the following information:

(a) in the period of one year and six months, between the enactment of the Kakaako Ordinance and May 2, 1978, seventy-eight applications for variance or modification were filed under Section IV-A of the Kakaako Ordinance;

(b) the Developers' application was the 54th application in the order of filing;

---

[13] RHC § 3-203 provides:

Every bill which has passed the council and has been duly authenticated by the city clerk and the presiding officer of the council shall be presented to the mayor for his approval. If he approves it, he shall sign it, and it shall then become an ordinance. If he disapproves it, he shall specify his objections thereto in writing and return the bill to the city clerk with his objections within ten days (excluding Saturdays, Sundays and holidays) after receiving it. If he does not return it with his disapproval within that time, it shall take effect as if he had signed it.

(c) out of the 78 applications which were filed, 61 applications were approved, and 17 applications were withdrawn or not processed for various reasons;

(d) an application by the Academy to construct a two-story addition to the existing structure, which was filed on July 13, 1976, one year before the filing of the Developers' application, was among the 61 applications which were approved;

(e) out of the 61 applications which were approved:

56 applications were approved upon the recommendations of DLU;

4 applications were approved upon the recommendations of OCS; and

1 application was approved upon the recommendation of the Committee of the Whole; and

(f) among the four applications which were approved upon the recommendations of OCS, one was the Developers' application, and another was an application filed by Automotive Service Co., Ltd., on May 27, 1976, one year before the filing of the Developers' application, which was referred by the City Council to OCS after DLU recommended denial.

The appeal record contains two additional exhibits, certified by the City Clerk, which shows the following:

(a) Under the Waikiki Ordinance, three applications for variance or modification were filed between February 5, 1975, and February 19, 1976; one application was approved upon the recommendation of the DLU; one application was approved upon the recommendation of the Chief Planning Officer; and, on one application, DLU recommended denial, the Planning Commission recommended approval, and, after reference to OCS, the City Council determined that it could be processed under Ordinance No. 4573, the Waikiki Special Design District Ordinance.

(b) Under Ordinance No. 77-84, the Agricultural District Ordinance, 54 applications for variance or modification were filed between September 19, 1977, and May 2,

1978; of those applications, 45 applications were approved and nine applications were not processed for various reasons; of the 45 applications which were approved, 42 applications were approved upon the recommendations of DLU, one application was approved upon the recommendation of OCS, and two applications were approved upon the recommendations of PZC after DLU recommended denial.

The foregoing review shows that the program of interim control of land development by the enactment and operation of IDC ordinances was a program well established, widely used, and universally accepted in the City and County of Honolulu before plaintiffs filed their complaint; that, in the operation of the program, DLU played a substantial and significant role by serving ungrudgingly as a consulting agency to the City Council; that the City Council approval of the Developers' application, after DLU recommended denial had its precedents; that the City Council did nothing extraordinary in connection with its approval of the Developers' application; and that, if the City Council did anything with respect to the Developers' application, which it did not do in connection with other applications, it was the effort it made in accommodating the concerns of the public sector.

Getting back to the first three issues on this appeal, plaintiffs contend that the City Council approval of the Developers' application was invalid with respect to all three issues.

Plaintiffs have not articulated the rationale for their contention in an orderly manner.

From the argument in plaintiffs' brief, the rationale on the first issue appears to be as follows:

The Developers' application involved a legislative act. That being the case, the City Council should have approved it by ordinance. If the City Council did so, the ordinance would have been submitted to the Mayor for approval or disapproval, thereby providing the Mayor an opportunity to veto the same if he was so inclined. However, the City Council approved the application by voting on motion for approval without going through the formality of enacting an ordinance. The veto power of the

Mayor does not extend to such action. By thus depriving the Mayor of an opportunity to exercise his veto power, the City Council violated the principle of checks and balances.

That rationale stands or falls depending on whether the City Council approval of the Developers' application involved a legislative act or a non-legislative act.

Under RHC, section 3-101, the legislative power of the City and County of Honolulu is vested in, and exercised by, the City Council.

In exercising its legislative power, the City Council is required to do so by ordinance, under the first sentence of RHC section 3-201, which reads: "Every legislative act of the council shall be by ordinance."

The second sentence of RHC, section 3-201, provides: "Non-legislative acts of the council may be by resolution, and except as otherwise provided, no resolution shall have force or effect as law."

That provision implies that the City Council has non-legislative power, in addition to its legislative power.

In exercising its non-legislative power, the City Council may do so by resolution or by resorting to some other parliamentary procedure, such as by voting on a motion made at council meeting. That is implied in the use of the word "may" in the second sentence, in contrast to the use of the word "shall" in the first sentence. Furthermore, there are numerous cases which hold that municipal council actions based on votes taken on oral motions made at council meetings amount to resolutions. Illustrative of such cases are: *Meade v. Dane County*, 155 Wis. 632, 642, 145 N.W. 239, 243 (1914), which states, "when an oral motion is adopted by the common council it becomes a resolution"; and *Town of Irvington v. Ollemar*, 128 N.J. Eq. 402, 406, 16 A.2d 563, 566 (1940), which states, "Any action of the body, which does not rise to the dignity of an ordinance, is a resolution".

A legislative act predetermines what the law shall be for the regulation of future cases falling under its provisions. *Forstner v. City and County of San Francisco*, 243 Cal. App. 2d 625, 52 Cal. Rptr. 621 (1966).

Under that definition, the Kakaako Ordinance was a legislative act. Even under plaintiffs' definition that an ordinance is a general law which establishes a policy, the Kakaako Ordinance was a legislative act.

However, approval of an application for variance or modification under section IV-A of the Kakaako Ordinance would have been a non-legislative act, not a legislative act.

A non-legislative act executes or administers a law already in existence. *Kelley v. John,* 162 Neb. 319, 75 N.W.2d 713 (1956); *Keigley v. Bench,* 97 Utah 69, 89 P.2d 480 (1939).

The City Council approval of the Developers' application was a non-legislative act because it administered a law already in existence, the law already in existence being section IV-A of the Kakaako Ordinance.

Under RHC, section 5-104(1), the veto power of the Mayor extends to ordinances, resolutions authorizing proceedings in eminent domain, and resolutions adopting or amending the General Plan.

Treating the Developers' application as a non-legislative matter, the City Council approved the same at its meeting on September 21, 1977, upon the motion of City Councilman Pacarro, seconded by City Councilman Koga, and amended the September 21, 1977, approval at its meeting on November 10, 1977, upon the motion of City Councilman Kaapu, seconded by City Councilman Loo.

The City Council actions of September 21, 1977, and November 10, 1977, were not subject to the veto power of the Mayor because they were not ordinances, resolutions authorizing proceedings in eminent domain, or resolutions adopting or amending the General Plan.

In taking those actions, the City Council did not violate the principle of checks and balances, because it did so in accordance with the procedure authorized in the second sentence of RHC, section 3-201, and not with any intent to circumvent the veto power of the Mayor.

Plaintiffs' premise that the Developers' application involved a legislative act is based on the provision in section IV-A of the Kakaako Ordinance which predicated approval of

an application for variance or modification upon a determination by the City Council "in its *legislative discretion* that such variance or modification is consistent with the spirit of the amendments to the General Plan, Detailed Land Use Map, Development Plan and Comprehensive Zoning Code upon which this ordinance is based and with the health, safety, morals and general welfare of the City and County of Honolulu." (Emphasis supplied)

Reliance of plaintiffs on the words "legislative discretion" used in the quoted provision is misplaced. Plaintiffs have read those words out of context. In the context in which those words were used, we construe them to mean in the discretion of the City Council, which has non-legislative power, in addition to its legislative power.

In that connection, we agree with the following statement in *In re Addison*, 385 Pa. 48, 57-58, 122 A.2d 272, 276 (1956):

There is no special virtue in the word "legislative" merely because it stems from the same root as "legislature". It derives its qualifying meaning from the character of the thing done.

Also, in connection with their contention on the first issue, plaintiffs refer to the Mayor's letter of October 18, 1977, to Ing, which contains the following statement:

I am concerned that under the present provision of the Kakaako Interim Development Control Ordinance the City Council has established sole authority in granting appeals from the Ordinance. In essence, the administration has been cut off from a "checks and balances" type of review of the legislative actions.

The Kakaako Ordinance would not have become effective, if the Mayor vetoed it and the City Council did not override the veto. The Mayor approved it on January 23, 1976. Also, if he had not approved its extension, and the City Council did not override the veto, it would have expired on November 28, 1976, with the result that, after November 28, 1976, the Developers would have been permitted to construct the building in their project to the maximum height and

density allowed under the existing CZC in Apartment District 4-A. The Mayor approved extensions of the Kakaako Ordinance three times, first, by approving Ordinance No. 4654, which extended the expiration date from November 28, 1976, to May 28, 1977; second by approving Ordinance No. 77-51, which extended the expiration date from May 28, 1977, to November 30, 1977; and third, by approving Ordinance No. 77-113, which extended the expiration date from November 30, 1977, to June 30, 1979. Ordinance No. 77-113 was approved on November 17, 1977, four weeks after the Mayor wrote his letter to Ing.

It may also be stated that on October 19, 1977, one day after the date of his letter to Ing, the Mayor approved Ordinance No. 77-103, the Pohakupu Ordinance; Ordinance No. 77-101, which extended the Kailua Ordinance to June 30, 1979; and Ordinance No. 77-102, which extended the Kaneohe Ordinance to June 30, 1979.

The Pohakupu Ordinance, the Kailua Ordinance, and the Kaneohe Ordinance had appeal provisions identical with section IV-A of the Kakaako Ordinance.

Plaintiffs' contention on the first issue is without merit.

With respect to the second issue, the following appears to be plaintiffs' rationale:

The government of the City and County of Honolulu consists of the Legislative Branch and the Executive Branch, which are coordinate and co-equal in rank, importance, independence and dignity. The legislative power of the city and county is vested in, and exercised by the City Council. The executive power of the City Council is vested in and exercised by the Mayor, as the chief executive officer. The Kakaako Ordinance was a zoning ordinance. DLU is charged with the administration of zoning ordinances. DLU is a department in the Executive Branch. The City Council approval of the Developers' application was, in effect, an order issued by the City Council to DLU to take specific action with respect to a particular parcel of land. In issuing such order, the City Council violated the principle of separation of powers.

There are two flaws in that rationale. One flaw is that the Kakaako Ordinance was not a zoning ordinance; the other is that the City Council approval of the Developers' application cannot be construed as an order by the City Council to DLU.

With respect to zoning ordinances, it is provided in RHC, section 6-1006, as follows:

> *Zoning Ordinances.* The council shall, after public hearings, enact zoning ordinances which shall contain the necessary provisions to carry out the purpose of the general plan and development plans. In enacting the ordinances, the council shall take into consideration the character of the several parts of the city and their peculiar suitability for particular uses and types of development with a view to encouraging the most appropriate use of land throughout the city. The ordinances shall contain reasonable standards with respect to the location, height, bulk, size of buildings and other structures, the area of yards, courts, off-street parking spaces and facilities and other open spaces, the density of population, and the use of buildings, structures and land for trade, industry, business, residence or other purposes.

The Kakaako Ordinance was not a zoning ordinance because it did not contain any of the provisions mentioned in the charter section quoted above.

As explained earlier in this opinion, the Kakaako Ordinance was an IDC Ordinance. IDC ordinances are frequently referred to as interim or stop gap zoning ordinances. In that connection, it is stated in Rathkoph, The Law of Zoning and Planning (1979), § 11.01, as follows:

> Interim or stopgap zoning are terms which have been used to describe ordinances or resolutions adopted to prevent the issuance of building permits pending the adoption of revisions of the existing zoning ordinances or pending consideration of a proposal to zone or rezone a particular area. . . . The term is misleading since putting a freeze on building permits or otherwise preventing all use of land is not zoning, either interim or stopgap, and might be more properly termed as a moratorium upon the issuance of building permits.

Zoning ordinances are administered by DLU, under RHC, section 6-1003(d), which provides that the Director of DLU shall:

Be charged with the administration of the zoning and subdivision ordinances and rules and regulations adopted thereunder and any regulatory laws or ordinances which may be adopted to supplement or replace such ordinances.

DLU was not charged with the administration of the Kakaako Ordinance because that ordinance was not a zoning ordinance or an ordinance adopted to supplement or replace a zoning ordinance.

To say that the City Council approval of the Developers' application was an order by the City Council to DLU to take specific action with respect to a particular parcel of land, or that it had such effect, is sheer absurdity. By no stretch of imagination can the approval be construed to be an order to DLU.

The role of DLU in connection with the Developers' application was not to approve or deny the application, but was limited to submission of "a report and recommendation of said department with respect to the effect of the prospective variance or modification upon the proposed amendments to the General Plan, Detailed Land Use Map, Development Plan, and Comprehensive Zoning Code." In other words, DLU was a consulting agency, not a decision making agency.

The Kakaako Ordinance did not mandate that all applications for variance or modification be referred to DLU. The mandate in the ordinance was to refer such application to "appropriate Department." The Developers' application could have been referred to the Planning Commission as the appropriate department. The Planning Commission is an agency in the Executive Branch.

If the application had been referred to the Planning Department, the probability would have been excellent that it would have recommended approval in view of its report of April 27, 1976, to the City Council recommending rejection of

the proposed HCS District No. 5 Ordinance on the grounds, among others:

(a) there were adequate existing governmental controls to insure the preservation of the Academy and Thomas Square;

(b) the impact of high rise structures upon the internal courts of the Academy was not sufficient to deprive surrounding property owners of reasonable density and height then allowed by CZC; and

(c) the proposed ordinance envisioned a new land use policy for the area that was not consistent with the existing General Plan, DLUM, and CZC.

Thus, on the second issue too, we see no merit in the plaintiffs' contention.

On the third issue, it is plaintiffs' position that the City Council actions of September 21, 1977, and November 10, 1977, on the Developers' application were invalid because they were illegal spot zoning actions; were not ordinance and amendment to ordinance; and, in taking those actions, the City Council disregarded:

(a) procedural requirements applicable to enactment of ordinances;

(b) procedural requirements applicable to zoning appeals;

(c) requirement of the Kakaako Ordinance for a finding of undue hardship;

(d) intent of the Kakaako Ordinance to prevent a race of diligence; and

(e) requirement of the Kakaako Ordinance for a review of proper data and justification report.

Spot zoning is an arbitrary zoning action by which a small area within a large area is singled out and specially zoned for a use classification different from and inconsistent with the classification of the surrounding area and not in accord with comprehensive plan. *Smith v. Skagit County*, 75 Wash. 2d 715, 453 P.2d 832 (1969); *Tennison v. Shomette*, 38 Md. App. 1, 379 A.2d 187 (1977).

The City Council actions on the Developers' application did not single out the project site for a use classification

different from and inconsistent with the CZC classification of the surrounding area, which was Apartment District A-4.

The Kakaako Ordinance did not disturb the underlying zoning of the area embraced therein. It merely prohibited the Building Department from accepting applications for permits for construction within the interim development control area, except in those cases where the City Council approved applications for variance or modification.

The function of the City Council actions of September 21, 1977, and November 10, 1977, was to permit the Building Department to accept the Developers' application for a building permit within the ambit of those actions. The ambit of the City Council actions was within the ambit of the CZC provisions applicable to Apartment District 4-A.

The City Council actions of September 21, 1977, and November 10, 1977, were not ordinance and amendment to ordinance. They were not, because, as explained earlier in this opinion, the Developers' application involved a non-legislative matter, and was not required to be approved by ordinance and amendment to ordinance.

We state below our response to the other points raised by plaintiffs in connection with the third issue.

(a) Disregard of procedural requirements
applicable to enactment of ordinances
and amendments to ordinances

Plaintiffs cite RHC, section 3-201, which provides that every legislative act of the City Council shall be by ordinance; RHC, section 3-202(8), which provides that all ordinances shall be promptly advertised once in a daily newspaper of general circulation in the City and County of Honolulu; RHC, section 3-203, which provides that every bill for an ordinance which has passed the City Council shall be presented to the Mayor for his approval; and RHC, section 3-204, which provides that no ordinance shall be amended by the City Council except by ordinance.

RHC, section 3-201, was not applicable to the Developers' application for variance or modification because the application involved a non-legislative matter, actions on which were

not required to be taken by ordinance or amendment to ordinance.

RHC, sections 3-202(8), 3-203, and 3-204 were not applicable to the City Council actions of September 21, 1977, and November 10, 1977, because those actions were not ordinance and amendment to ordinance.

### (b) Disregard of procedural requirements applicable to zoning appeals

Plaintiffs cite RHĊ, section 6-1009(b) which authorizes the Zoning Board of Appeals to hear and determine petitions for varying the application of zoning ordinances with respect to specific parcels of land, and to grant such variance upon the ground of unnecessary hardships if the record shows that:

(1) the applicant would be deprived of the reasonable use of such land or building if it were used only for the purpose allowed in that zone;

(2) the request of the applicant is due to unique circumstances and not the general conditions in the neighborhood so that reasonableness of the neighborhood zoning is not drawn into question; and

(3) the use sought to be authorized by the variance will not alter the essential character of the locality nor be contrary to the intent and purpose of the zoning ordinance.

That provision did not apply to the Developers' application because the Developers' application was not a petition for varying the application of a zoning ordinance with respect to a particular parcel of land, but was an application for variance or modification under the Kakaako Ordinance, which was not a zoning ordinance.

### (c) Disregard of the requirement of the Kakaako Ordinance for a finding of undue hardship

The Kakaako Ordinance included section IV-A among its provisions "in order to avoid the imposition of any inequities and undue hardships" in its application.

However, the ordinance did not contain any provision requiring the City Council to make a specific finding of undue hardship as a condition precedent to its approval of an application for variance or modification.

The inequities and undue hardships in the Kakaako Ordinance lay in the total prohibition of acceptance by the Building Department of any application for a permit to build within the interim development control area covered in the ordinance. In that situation, the existence of undue hardship would have been self-evident and a finding of undue hardship would have been a mere formality, a ritual incantation of the obvious.

In that connection, the following statement of Judge Cardozo in *Wood v. Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 (1917) is apposite:

The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view to-day.

We hold that absence of a finding of undue hardship did not invalidate the City Council actions on the Developers' application.

(d) Disregard of the intent of the
Kakaako Ordinance to prevent a
race of diligence

In connection with municipal ordinances involving zoning and building requirements, there is a race of diligence on the part of applicants for building permits when they file their applications before the effective date of a new ordinance in order to take advantage of the more liberal provisions of the existing ordinance.

The Kakaako Ordinance prevented a race of diligence. However, in the context of that ordinance, prevention of a race of diligence was not an end in itself, but was a means to an end, that is, it was a means to accomplish an objective sought in the ordinance.

At the time it enacted the Kakaako Ordinance, the City Council was in the process of revising the existing development policies and plans for the Kakaako area by reviewing, evaluating, and updating previous planning studies.

The Kakaako Ordinance had two interrelated objectives, of which one may be characterized as primary and the other as subsidiary.

The primary objective was to assure the effectiveness of the contemplated policies and plans upon their finalization and adoption. That objective would have been frustrated, if property owners in the area engaged in a race of diligence to develop their lands pursuant to the provisions of the existing ordinance before the finalization and adoption of the revised policies and plans. So, in order to avoid such frustration, the Kakaako Ordinance prevented a race of diligence by prohibiting the Building Department from accepting applications for building permits for proposed projects in the area, pending the finalization and adoption of the revised policies and plans.

However, a total ban on acceptance of applications for building permits by the Building Department would have imposed inequities and undue hardships on some of the affected property owners. Consequently, the Kakaako Ordinance had, as its subsidiary objective, avoidance of the imposition of such inequities and undue hardships. The ordinance provided for the accomplishment of such objective by authorizing the City Council to grant variance or modification of the application of any provision thereof with respect to any project as to which it determined in its legislative discretion that such variance or modification was consistent with the spirit of the amendments to the General Plan, DLUM, Development Plan, and CZC, and with the health, safety, morals, and general welfare of the City and County of Honolulu.

The City Council actions of September 21, 1977, and November 10, 1977, accomplished an objective of the Kakaako Ordinance, described as subsidiary objective in this discussion, without disregarding any intent of the ordinance in any manner.

(e) Disregard of the requirement of the
Kakaako Ordinance for a review of
proper data and justification report

The Kakaako Ordinance provided, in section IV-B thereof, that applications for variance or modification be accom-

panied by support data and justification report.

In connection with that provision, DLU prepared guidelines to be followed by applicants. It did so because, as stated in its letter to the City Clerk, most of the applications were referred to it and many applications lacked some essential details necessary for its review and recommendation.

The Developers prepared their application in accordance with the DLU guidelines, and filed the same with the City Clerk on July 11, 1977. Thereafter, the following proceedings took place:

*July 13, 1977:* City Clerk forwarded the application to DLU;

*August 17, 1977:* DLU prepared its report and recommendation, identified as Departmental Communication No. 1229, based on an analysis and review of the data in the application;

*September 7, 1977:* PZC reviewed DLU report and recommendation, and referred the matter to OCS for review and recommendation;

*September 14, 1977:* PZC reviewed OCS report and recommendation, identified as Council Communication No. 318, which was also based on an analysis and review of the data in the application, and voted to report out Departmental Communication No. 1229 and Council Communication No. 318, to the City Council for appropriate action at its meeting on September 21, 1977;

*September 21, 1977:* City Council had before it Committee Report No. 1911, which reported out Departmental Communication No. 1229 and Council Communication No. 318, and voted to act on Council Communication No. 318.

The foregoing chronology of events clearly shows that the City Council had before it, at its meeting on September 21, 1977, the support data provided by the Developers in their application, and voted on Council Communication No. 318, upon reviewing such data.

The Developers' application did not contain a separate justification report, but a separate justification report was not necessary because the support data, in essence, constituted a

justification report. If a separate justification report was required, the Developers' letter to the City Clerk, quoted on page 7 of this opinion, may be treated as such justification report.

Plaintiffs stated in their brief that "City Council admittedly never required justification report and like data", citing pages 571 and 572 of the Circuit Court files in the appeal record.

The cited pages in the Circuit Court files contain nothing which even remotely supports that statement.

Plaintiffs further argue that separate support data and justification report were necessary in connection with the City Council action of November 10, 1977.

In that connection, plaintiffs cite *Gramatan Hills Manor, Inc. v. Manganiello*, 213 N.Y.S.2d 617 (1961), for the proposition that developer's own reduction in size of already-approved project divests him of vested right both as to larger original project and reduced project; and *Ross v. Montgomery County*, 252 Md. 497, 250 A.2d 635 (1969), for the proposition that where a developer himself changes his mind as to performance on his project, he loses his vested right in that project.

The cited cases are entirely inapposite. Those cases have nothing to do with filing of support data when there is some change in a proposed project.

*Gramatan Hills Manor, Inc. v. Manganiello* involved a change in the proposed project from a conventional type apartment development of 87 units to a cooperative type apartment development of 59 units. The court stated its holding in the case as follows:

> The issuance of the original permit avails the petitioner nothing, under the facts here, as the revision of the plans so changed the character and design of the original building as to render it ineffectual, acknowledged by the petitioner when it filed a new application.

213 N.Y.S.2d at 622.

*Ross v. Montgomery County* involved a forfeiture of building permit because of failure of the developer to begin con-

struction within the time specified in the permit. The nature of the case appears in the following statement of the court:

> In the case at bar, the permit, which the planning was intended to complement, expired for want of performance, and with that expiration any vested right, which may have existed, became forfeit.

252 Md. at 507, 250 A.2d at 640-41.

The Developers did not file any support data and justification report specifically for the development involved in the City Council action of November 10, 1977.

Such filing was not necessary for two reasons: one, the City Council action of November 10, 1977, was not an action on a new application but involved amendments to the September 21, 1977, action; and, two, it did not change the character and design of the development approved in the September 21, 1977, action.

As a matter of fact, the City Council action of November 10, 1977, made only one change in the development approved on September 21, 1977. That change was the reduction of 50 feet in the height of the proposed apartment building from 350 feet to an average of 299 feet, by reducing the number of apartment floors from 35 floors to 30 floors. The reduction of the number of apartment units in the building from 177 units to approximately 150 units would have automatically resulted from the proposed reduction in height because each apartment floor contained five apartment units. There was no change in the setback from Victoria Street because the building approved on September 21, 1977, had already been set back 95 feet from Victoria Street.

Such change was too obvious to require a filing of new support data and justification report.

In connection with the third issue, it may also be stated that, although the City Council did not give notice of public hearing and did not hold any public hearing on the Developers' application, because it was not required to do so, plaintiffs have no reason to complain inasmuch as they were heard at the Committee of the Whole meeting, which preceded the City Council meeting of November 10, 1977, by Callan and

Hanson, who were present throughout the committee meeting and were invited to speak, and did speak, at the meeting.

Also, it may be stated that, although plaintiffs gratuitously took upon themselves the cudgels on behalf of the Academy by devoting several pages of their brief to the argument that the Academy at no time agreed to the development approved in the City Council action of November 10, 1977, the appeal record belies that argument.

The best evidence in that regard is the statement from the mouth of the representative of the Academy. At the Committee of the Whole meeting, Duane Preble represented the Academy, and engaged in the following colloquy with City Councilman Kaapu and City Councilman Pacarro:

Kaapu: Well, Duane, have you seen the committee report now.

Preble: No have not.

Kaapu: Why don't you take a quick look. It's very short.

Preble: Okay, yes.

Kaapu: It's just separate from the resolution now. See, before us is the resolution which you have and the committee report so that the vote we'd have to take would probably be the "aye" or "nay" on these. What is your recommendation to the group? I think that's what Mr. Pacarro wanted to know.

Pacarro: My question, Duane, is do you understand the committee report, the intent of it? So that —

Preble: Yes, I think I do, I think I do and *I agree*. (Emphasis supplied)

The agreement of the Academy to the proposed development is also confirmed by the fact that, at the public hearing held on January 25, 1978, on the proposed HCS District No. 5 Ordinance, Preble was present but had not signed up to testify, and the fact that the Academy did not join as one of plaintiffs in the complaint in this case.

We now move on to the fourth issue, which is concerned with the effective date of the City Council approval of the Developers' application for variance or modification.

That issue is relevant in connection with plaintiffs' contention that the height restriction in HCS District No. 5 Ordinance applied to the Admiral Thomas project because the approval was not final until October 25, 1978, when the City Council exercised "its discretion concerning compliance of the conditions contained in Committee of the Whole Report No. 174", in accordance with the verbal opinion of Deputy Corporation Counsel Nakamoto.

In connection with that issue, the crucial date was the effective date of the City Council action of November 10, 1977, not the effective date of the City Council action of September 21, 1977, because the later action amended, and thereby superseded, the earlier action.

We will refer to the City Council action of September 21, 1977, here only insofar as the approval of the Developers' application for variance or modification therein was with three conditions, which are set forth on page 401 of this opinion.

Those conditions are repeated below for convenience in referring to them in our discussion of the problem involved in the determination of the effective date of the November 10, 1977, action. They are:

(1) The applicant shall modify the drawings as necessary to substitute other nonreflective and unobtrusive tinted glass, color and texture for the exterior finish of the building. The intent is to make the building as much as possible visually unobtrusive as seen from the Academy of Arts courtyard as well as from other highly developed and heavily travelled areas of Oahu.

(2) Prior to the issuance of the building permit, all final drawings and plans specifying the size, spacing, type and identification of the proposed plant material and trees, samples and specifications of exterior colors, textures and finishes shall be submitted for review and approval by the Director of Land Utilization.

(3) Prior to the issuance of the Certificate of Occupancy, all approved landscaping and planting requirements shall be implemented and completed by the applicant.

On November 10, 1977, the City Council adopted Resolution No. 512, the contents of which are set forth on pages 404-05 of this opinion, and the amendments to its September 21, 1977, action which were incorporated in Committee of the Whole Report No. 174.

The transcript of the City Council proceedings and the Committee of the Whole proceedings of November 10, 1977, which was attached to plaintiffs' memorandum in opposition to the Developers' motion for summary judgment, and therefore made a part of the record by plaintiffs themselves, shows the following:

*November 3, 1977.* Ing wrote to the City Council that the Developers were prepared to offer the amendments to the City Council action of September 21, 1977, which were incorporated later in Committee Report No. 174.

*November 7, 1977.* By Council Communication No. 417, City Councilman Kaapu requested the City Council, on behalf of City Councilmen Holck, Koga, Matsumoto, and Pacarro, that a special meeting of the City Council be scheduled for 2 o'clock, p.m., on November 10, 1977, "to consider amendments/reconsideration to the 'Admiral Thomas' project which was previously approved by the City Council".

*November 10, 1977.* The special meeting of the City Council requested by City Councilman Kaapu, convened at 2:04 o'clock, p.m. At 2:15 o'clock, the City Council resolved itself into Committee of the Whole, with City Councilman Kaapu, as chairman, to discuss the draft of Resolution No. 512 and the draft of Committee Report No. 174. At the committee meeting, the proposed resolution and the proposed committee report were discussed in great detail. Present at the committee meeting were Callan, Hanson, Preble, and Ing, who were invited to participate in the discussion. In that connection, the committee recessed for one minute between 2:35 o'clock and 2:36 o'clock to afford those persons an opportunity to acquaint themselves with the contents of the proposed resolution and the proposed committee report. The com-

mittee rose at 2:53 o'clock to report out Committee Report No. 174, which read as follows:

Your Committee of the Whole recommends adoption of the resolution relating to Admiral Thomas Condominium project as submitted by Councilman Kaapu.

It further recommends that the action of the Council relating to said Admiral Thomas Condominium project taken on September 21, 1977 in connection with the Kakaako Interim Development Control District ordinance be amended to provide for a building of not more than an average height of 299 feet, a density of approximately 150 units, and a set back from Victoria Street of not less than 95 feet. The three conditions initially imposed pursuant to Council Communication No. 318 shall remain unchanged.

Thus, the Committee of the Whole meeting lasted more than 30 minutes. Upon reconvening, the City Council considered Resolution No. 512 first, upon the motion for adoption made by City Councilman Kaapu, seconded by City Councilman Loo, and, after a discussion, adopted the same. Thereafter, the City Council proceeded to consider the amendments to the City Council action of September 21, 1977. In that connection, City Councilman Kaapu made two preliminary motions. The first preliminary motion was

to consider amending City Council's approval of Admiral Thomas Project . . . by adding further conditions relating to building height and number of condominium units.

The second preliminary motion was

to amend City Council's approval of the Admiral Thomas project by adding further conditions relating to its building height and number of condominium units as specified in the report of the Committee of the Whole in the hands of the Clerk.

After the City Council passed the preliminary motions, City Councilman Kaapu moved to adopt the additional conditions as contained in the report of the Committee of the Whole *with the Council reserving jurisdiction in the matter,* which motion was seconded by City Councilman Loo, and passed by the City Council. (Emphasis supplied)

The three-step procedure described above was followed upon the recommendation of Deputy Corporation Counsel Nakamoto. The reason for such recommendation does not appear in the appeal record. Presumably, the reason for the recommendation was that the City Council by its action of September 21, 1977, was deemed to have approved the Admiral Thomas project and that, after such approval, the proper procedure to effectuate the offer made in Ing's letter of November 3, 1977, to the City Council was to amend, rather than to reconsider, the September 21, 1977, action.

In Departmental Communication No. 550, dated April 20, 1978, from DLU to the City Council, purporting to be in response to Committee Report No. 174, DLU included, as an additional condition of that report, an item reading as follows:

> No building permit shall be issued to the developers unless and until Council has had opportunity to review the project as to whether it has met the six conditions imposed by the Council . . . The appropriate departments would be required to submit a written report to the Council whether the project did or did not meet the six conditions imposed by the Council.[14]

There was nothing in Committee Report No. 174, which could have been construed as imposing such condition.

In a footnote in Departmental Communication No. 550, DLU attributed such condition to "Corporation Counsel clarification on the amendment to Committee Report No. 174 — March 23, 1978."

By Corporation Counsel clarification on the amendment to Committee Report No. 174, DLU might have meant clarification by the corporation counsel of the words "with the Council reserving jurisdiction in the matter", in City Councilman Kaapu's motion to adopt the additional conditions contained in the report of the Committee of the Whole.

---

[14] The six conditions mentioned in the quoted item included, in addition to the three conditions initially imposed in the City Council action of September 21, 1977, the provisions in Committee Report No. 174 relating to height, number of apartment units, and setback from Victoria Street.

If such was the case, the corporation counsel misconstrued those words, went beyond clarification, and, in effect, assumed the role of a legislator.

It is clear from the transcript of the Committee of the Whole proceedings on November 10, 1977, and the discussion of Resolution No. 512 at the City Council meeting which followed the Committee of the Whole meeting, that reservation of jurisdiction in the mentioned motion had reference to reservation of jurisdiction by the City Council to amend the action taken by it on that day in the contingency any of the options in Resolution No. 512 should materialize before the Developers filed their application for building permit. If such jurisdiction was not retained, there would have been a question whether the City Council could amend, after its approval of the Developers' application for variance or modification. The City Council did not face that problem with respect to its approval of the Developers' application in its September 21, 1977, action because the amendments to that approval were made pursuant to an offer of changes made by the Developers, and the Developers would not have questioned the authority of the City Council to amend.

At the outset of the Committee of the Whole meeting, City Councilman Kaapu, as chairman of the committee, stated:

Let me explain, you have a resolution before you and there is also a requirement for a committee report with certain information which I will read off later to go in it. And the reason for that is, there are essentially two types of actions required. One is the setting forth of options and the other is to limit the potential development further than that which we had done previously by our actions.

Later in the committee discussion, he reiterated the same point as follows:

The committee report places a ceiling upon the available development *should the developer go ahead and seek a building permit without waiting for the compromise to take place*. It would reduce the potential height to that compromise to at least that compromise which he proposed, which is reduced by five stories, approximately, and by to about 150 units. It would put that ceiling on the

building permit before the compromise is effectuated. (Emphasis supplied)

The compromise mentioned in the foregoing statement was adoption of any of the four options set forth in Resolution No. 512. The statement shows that, under the City Council approval of their application for variance or modification, the Developers could apply for a building permit without waiting for the materialization of any option under Resolution No. 512.

Still later in the discussion, the following colloquy took place between Chairman Bornhorst and City Councilman Kaapu:

Bornhorst: One clarification. You said that this is an intent and that when the compromise is finalized they must come back to the Council anyway?

Kaapu: That's right.

Bornhorst: What would be our action then?

Kaapu: It would be similar to the action we're taking on the limitation.

Bornhorst: There would be another resolution or what will it be?

Kaapu: No, it would be an amendment.

Bornhorst: Amendment to the original exception that was made to the IDC?

Kaapu: That is right.

Bornhorst: So this is establishing of an intent, and actually it's giving several options, as I understand it.

Kaapu: That's right!

Bornhorst: Some of which actually may be contradictory, but at least it is showing a very good and I think really very cooperative effort in achieving a compromise.

*So with the assurance that the Council will have a final look at it I'm willing to support it and I'd like to commend you on your effort.* (Emphasis supplied)

In the discussion on Resolution No. 512, at the City Council meeting which convened after the Committee of the Whole meeting, City Councilman Koga expressed the hope that

some concrete result would emerge under the resolution, and stated:

> Correct me if I'm wrong, I think that is our intent to have them, and if they have something concrete that they would want further amendment et cetera for us to consider, they can bring it back to us at that time.

To that statement, Chairman Bornhorst responded:

> I think that's the important point, that we still are maintaining jurisdiction.

There is not one word in the transcript of the City Council proceedings and the Committee of the Whole proceedings of November 10, 1977, or in any other part of the appeal record, which even intimated that retention of jurisdiction by the City Council was for the purpose of overseeing performance by the Developers of the conditions set forth in the November 10, 1977, action.

Normally, under the Kakaako Ordinance, the City Council would have gone out of the picture completely upon approving an application for variance or modification, which would have lifted, with respect to the approved project, the ban imposed on acceptance by the Building Department of an application for a building permit, and, thereafter, the responsibility would have shifted to the Building Department to check the application for building permit before accepting it for filing, to process the application after the filing; and to issue the requested permit after processing the application and determining its compliance with all applicable requirements.

In such situation, the date of approval of the application for variance or modification and the effective date of such approval would have been the same.

However, in the case of the approval of the Developers' application for variance or modification, the City Council retained jurisdiction to amend the approval in the contingency any of the options in Resolution No. 512 should materialize before an application for building permit was filed pursuant to that approval.

The Developers filed their application for building permit with the Building Department, and the Building Department

accepted the application, on January 24, 1978. On that day, none of the options in Resolution No. 512 had materialized. That acceptance resulted in the lapse of the jurisdiction retained by the City Council to amend its November 10, 1977, action.

Plaintiffs have not contended that the acceptance of the Developers' application by the Building Department was improper.

Thus, the City Council approval of the Developers' application for variance or modification became final on January 24, 1978, and that was the effective day of the approval.

After its acceptance of the Developers' application for building permit, the Building Department had the sole responsibility of processing the application and issuing the requested permit, upon checking the plans, specifications, and other documents and materials submitted with the application and checking with the governmental agencies concerned therewith regarding the compliance of the application with the requirements of the Building Code, Electrical Code, Plumbing Code, CZC, other applicable statutes, ordinances, rules and regulations, and the conditions contained in the City Council action of November 10, 1977, applicable thereto.

Of the three conditions in the City Council action of November 10, 1977, which were carried over from the City Council action of September 21, 1977, conditions (1) and (2) related to matters which required compliance before the issuance of the requested building permit, and condition (3) related to a matter which required compliance before the issuance of a certificate of occupancy; none required compliance before the filing of the application for building permit, although, in the application which they submitted, the Developers had, in the light of condition (1) substituted for the wall glass specified in the support data accompanying the application for variance or modification, material described by DLU, in its report of April 20, 1978, as "non-reflective bronze tinted glass for exterior wall facades."

In the circumstance, after the acceptance of the Developers' application for building permit by the Building Department, DLU and the Developers should have addressed all

correspondence regarding the same to the Building Department and not to the City Council, and the City Council should not have involved itself in any matter relating thereto. The City Council did involve itself by its actions of May 17, 1978, on Committee Report No. 971, and October 25, 1978, on Committee Report No. 2074. However, in our opinion, those actions were harmless. The Building Department would have shirked its duty if it had issued the requested building permit to the Developers before all applicable requirements had been complied with. All public officers are presumed to have discharged their duties faithfully, in the absence of any evidence to the contrary. The record in this case contains no evidence to the contrary. Consequently, we presume that the Building Department issued the requested building permit because there was compliance with all applicable requirements, not because of any action taken by the City Council.

On the fifth issue, regarding the effect of Ordinance No. 78-18, the HCS District No. 5 Ordinance, on the City Council approval of the Developers' application, plaintiffs urge that the restrictive provisions of that ordinance applied to the Admiral Thomas project for two reasons:

*First,* the City Council approval of the Developers' application for variance or modification on November 10, 1977, did not become final until the City Council took its "final discretionary action" on October 25, 1978, eight months after the enactment of that ordinance; and

*Second,* the Developers acted in bad faith, and admitted their bad faith by moving for summary judgment on that issue.

In response to the first reason, we refer to our discussion of the fourth issue, in which we held that the effective date of the City Council action of November 10, 1977, approving the Developers' application for variance or modification was January 24, 1978, when the Developers filed, and the Building Department accepted, the application for a building permit for the Admiral Thomas project.

That effective date was almost one month before the enactment of the HCS District No. 5 Ordinance.

Courts may take legislative history into consideration in construing a statute. *Kamanu v. E. E. Black, Ltd.*, 41 Haw. 442 (1956); *In re Island Airlines*, 47 Haw. 87, 384 P.2d 536 (1963). The same applies to ordinances. Cf. Sutherland, Statutory Construction § 30.06, 4th ed. (1972).

Appended as Exhibit A to Mr. Justice Frankfurter's opinion in *Commissioner of Internal Revenue v. Church*, 335 U.S. 632, 687 (1949), is a list of 134 cases decided by the United States Supreme Court in the decade 1938-1948, in which legislative history was decisive in the construction of statutes involved therein.[15]

It is clear from (a) the discussion at the Committee of the Whole meeting of November 10, 1977; (b) the discussion at the public hearing held on the proposed HCS District No. 5 Ordinance on January 25, 1978; and (c) the HCS District No. 5 Ordinance as finally enacted, that the City Council did not intend that the ordinance should operate to deny to the Developers the building permit for the Admiral Thomas project, to which they would have been entitled, pursuant to the November 10, 1977, approval of their application for variance or modification under the Kakaako Ordinance.

At the Committee of the Whole meeting, the following discussion took place between City Councilmen Kaapu and Loo:

Loo: Number 3 there, you know, we are coming up shortly with urban design area for Thomas Square. Now, just assume for the moment that urban design will come up and say that that area should be no more than, just make it, let's say, no more than 25 feet high. You know this is 299 square feet. Now, would the compromise still go through? It won't be affected by the urban design plan that comes up?

Kaapu: Nobody knows when an ordinance on urban design or on the HCS will pass or under what criteria the

---

[15] Mr. Justice Frankfurter's opinion was a dissenting opinion, but a spot check of the cases in the list confirms their support of the proposition for which they were listed.

content will be shaped. We don't know that at this time, so it's not possible to respond directly to how it would affect a proposed development. However, since the Council has to approve whatever alternate compromise comes up before it can be built, I would think that any HCS or any other policy that we adopt, it wouldn't be a logical thing for the Council to adopt a policy conflicting with an earlier policy.

Reference to No. 3 in the foregoing discussion was to Option (3) of Resolution No. 512.

That discussion was followed by the following further discussion between the two City Councilmen:

Kaapu: ***If the project is built first before the urban design is passed then obviously it is not going to conform to an urban design policy if that policy conflicts. What I said earlier would apply though, for us to pass later an urban design policy which contradicts what we've already decided on. I just can't logically see how we will do that.

Loo: In other words that urban design policy will already include whatever we decided here,***.

Kaapu: Hawaiians say "a oi a". Right on, you hit it right on the head, that's exactly. "A oi a, Amene.***."[16]

At the public hearing on the proposed HCS District No. 5 Ordinance, Chairman Bornhorst deemed that any discussion of matters relating to the Admiral Thomas project was irrelevant to the consideration of the proposed ordinance, and stopped City Councilman Kaapu from delving into the status of the negotiation among affected parties under Resolution No. 512, by stating: "Could we keep questions relating to the rights and wrongs of this ordinance please?"

---

[16] According to Pukui — Elbert, Hawaiian Dictionary, "a oi a" means "you are right", and "Amene" means "Amen". Thus, "A oi a Amene" means, "You are right, Amen".

Additionally, Chairman Bornhorst answered Question No. 8(a) propounded in plaintiffs' interrogatories to her, as follows:

Did you at any time believe that Ordinance No. 78-18 (The Thomas Square/Academy of Arts Historic, Cultural and Scenic District Ordinance) applied to the action referred to in Question (1), supra?
*No.* (Emphasis supplied)

The action referred to in Question (1) was the granting of variance or modification to the Developers on September 21, 1977. Chairman Bornhorst had previously answered another question in plaintiffs' interrogatories by stating that the City Council action of November 10, 1977, referred back to the City Council action of September 21, 1977.

Also, at the same public hearing, Callan read a statement in which he suggested that, in order to assure that the proposed ordinance would apply to the Admiral Thomas project, a provision be incorporated therein making it applicable "not specifically to Admiral Thomas, but to any building which did not yet have building permit as being directly affected by this ordinance."

However, the City Council adopted Committee of the Whole Report No. 37, of February 8, 1978, recommending that Miscellaneous Communication No. 86, containing Callan's statement, be received and filed, and did not incorporate his suggestion in the final version of the ordinance.

The statements of City Councilman Kaapu, in his discussion with City Councilman Loo, at the Committee of the Whole meeting reiterated the well established principle of statutory construction incorporated in HRS § 1-3, as follows:

*Laws not retrospective.* No law has any retrospective operation, unless otherwise expressed or obviously intended.

The HCS District No. 5 Ordinance provided in section 6: In addition to the regulations set forth by this Ordinance, the underlying regulations of the zoning district shall continue to remain applicable; provided that if any conflict occurs, the more restrictive provisions shall apply.

There is no provision in the quoted section, or in any other section of the ordinance, which makes it operate retrospectively. Consequently, it operates only prospectively.

Plaintiffs state in their brief with regard to the appeal provision in section IV-A of the Kakaako Ordinance:

> It is significant to note that the above appeals provision was eliminated subsequent to the filing of this lawsuit by means of Ordinance No. 78-65, signed into law July 12, 1978.

The ordinance referred in the brief was not Ordinance No. 78-65, but Ordinance No. 78-64, the Revised Kakaako Ordinance.

That ordinance did not contain any appeal provision. We fail to see any significance in that omission on the issue regarding the applicability of the HCS District No. 5 Ordinance to the Admiral Thomas project.

The enactment of the HCS District No. 5 Ordinance did not automatically render the Kakaako Ordinance inapplicable to the area embraced in the HCS District No. 5 Ordinance because the two ordinances covered different subject matters, one being a zoning ordinance and the other being a moratorium on acceptance of applications for building permits.

It was only after the enactment of the Revised Kakaako Ordinance that the Kakaako Ordinance became inapplicable to the area embraced in the HCS District No. 5 Ordinance.

The Revised Kakaako Ordinance provided in section III-A-(1):

> In the event a Special Design District or Historic, Cultural, Scenic District ordinance shall be enacted prior to the specified date mentioned hereinabove [June 30, 1979], the area within such Special Design District or Historic, Cultural, Scenic District shall be thereafter excluded from the provisions of this ordinance;

and provided in section III-B-(3) thereof that nothing contained therein should be deemed to affect:

> The granting or issuance and/or approval of building permits in accordance with any approval of variance or modi-

fication granted by the City Council under Ordinance No. 4551.

It then repealed the Kakaako Ordinance in section IV thereof.

Those provisions in the Revised Kakaako Ordinance affirmed and expressed the clearly ascertainable intent of the City Council that the Admiral Thomas project be exempted from the operation of the HCS District No. 5 Ordinance.

At the very least, they raised sufficient ambiguity in the statutory scheme to justify our inquiry into legislative history to ascertain the intent of the City Council with regard to the applicability of the HCS District No. 5 Ordinance to the Admiral Thomas project.

With regard to the second reason for plaintiffs' contention that the restrictive provisions of the HCS Ordinance No. 5 applied to the Admiral Thomas project, which is concerned with the assertion that the Developers acted in bad faith in connection with the project, that is matter relevant to the seventh issue, and will be discussed in our consideration of that issue below.

On the sixth issue, regarding the effect of City Councilman Pacarro's participation in the City Council approval of the Developers' application for variance or modification, we hold that such participation did not have any effect on the approval.

The appeal record shows that City Councilman Pacarro voted on all City Council actions on the Admiral Thomas project without disclosing to the other members of the City Council that his reelection campaign committee had received a check for $400.00, dated June 22, 1977, from Stark Ventures, Ltd., for tickets to testimonial dinner for him, although such receipt was reported to the State Campaign Spending Commission.

Plaintiffs contend that such failure to disclose invalidated City Councilman Pacarro's decisive vote on the City Council approval of the Developers' application of September 21, 1977, and his vote on subsequent City Council actions on the Admiral Thomas project.

RHC, section 10-102.1, on Conflicts of Interest, provides that no elected or appointed official shall

Solicit or accept any gift, directly or indirectly, whether in the form of money, loan, gratuity, favor, service, thing or promise, or in any other form, under circumstances in which it can reasonably be inferred that the gift is intended to influence him in the performance of his official duties. Nothing herein shall preclude the solicitation or acceptance of lawful contributions for election campaigns;

and RHC, Section 10-103, provides:

Any elected or appointed officer or employee who possesses or who acquires such interests as might reasonably tend to create a conflict with the public interest shall make full disclosure in writing to his appointing authority or to the council, in the case of a member of the council, and to the ethics commission, at any time such conflict becomes apparent. Such disclosure statements shall be made a matter of public record and be filed with the city clerk. Any member of the council who knows he has a personal or private interest, direct or indirect, in any proposal before the council, shall disclose such interest in writing to the council. Such disclosure shall be made a matter of public record prior to the taking of any vote on such proposal.

There is nothing in the record showing that the check received by City Councilman Pacarro's reelection campaign committee was an unlawful contribution for election campaign. Consequently, the acceptance of the check was not subject to the disclosure provision of RHC, section 10-103.

In this connection, Ethics Commission Opinion No. 76, dated December 21, 1977, is pertinent. It stated that the Revised Charter Commission excepted the solicitation and acceptance of lawful campaign contributions from the operation of the conflicts of interest provision because it recognized that "campaign contributions should be covered by a separate law in view of its broad ramifications and desirability of uniform control throughout the State".

Finally, with regard to the seventh issue, which is concerned with the applicability of the doctrine of equitable estoppel on the City Council approval of the Developers' application for variance or modification, we reaffirm, as an additional ground for holding that the HCS District No. 5 Ordinance did not apply to the Admiral Thomas project, our prior decision in this case, reported in 60 Haw. 446, 592 P.2d 26 (1979), that the doctrine applied to that project.

This court first enunciated the doctrine of equitable estoppel, as it applied to land development, in *Denning v. County of Maui*, 52 Haw. 653, 485 P.2d 1048 (1971), and reaffirmed the viability of that doctrine in this jurisdiction in *Allen v. City and County of Honolulu*, 58 Haw. 432, 571 P.2d 328 (1977).

The doctrine of equitable estoppel is based on a change of position on the part of a land developer by substantial expenditure of money in connection with his project in reliance, not solely on existing zoning laws or on good faith expectancy that his development will be permitted, but on official assurance on which he has a right to rely that his project has met zoning requirements, that necessary approvals will be forthcoming in due course, and he may safely proceed with the project.

In this case, the first official assurance that the Developers may proceed with their project was given on September 21, 1977, when the City Council approved the Developers' application for variance or modification for an apartment building 350 feet high, containing 177 apartment units, and set back 95 feet from Victoria Street. That approval was followed on November 10, 1977, by amendments to the prior approval, which reduced the height of the apartment building to an average height of 299 feet and the number of apartments to approximately 150 units, while retaining the setback of 95 feet from Victoria Street.

Those approvals were official assurances on which the Developers had a right to rely to proceed with their project.

That was so, because although the effect of those approvals was merely to permit the Building Department to accept the Developers' application for a building permit for their project, the project was in compliance with the existing

zoning ordinances, and the function of the Building Department, after the acceptance of the application, was purely ministerial, to process the application for compliance with all applicable statutes, ordinances, rules and regulations, and the conditions attached to the approvals, and to issue the requested building permit after such processing.

The appeal record shows that between September 21, 1977, and November 10, 1977, the Developers spent for planning and design the sum of $84,909.89, of which $8,606.09 was for planning and $76,303.80 was for design.

That expenditure was made in reliance on the City Council action of September 21, 1977.

The record also shows that between November 10, 1977, and April 20, 1978, the Developers spent for planning and design the sum of $275,719.23, of which $75,898.24 was for planning and $199,820.99 was for design.

That expenditure was made in reliance on the City Council action of November 10, 1977.

Although the City Council adopted Resolution No. 512 on the same day, it is clear from the legislative history of the City Council action of November 10, 1977, on the Developers' application for variance and modification, that the approval of the application for variance and modification was not tied in with Resolution No. 512.

Thus, the Developers' expenditures mentioned above brought the Admiral Thomas project within the doctrine of equitable estoppel.

Neither in their opening brief nor in their reply brief have plaintiffs contended that those expenditures were improper, although, oddly enough, they contended that the Developers' expenditures before September 21, 1977, in connection with the Admiral Thomas project were made in bad faith. Plaintiffs stated their contention in connection with the Developers' expenditures before September 21, 1977, as follows:

> The Developers spent over $286,000.00 towards the Project before they ever submitted their plans to any governmental body, and before they received any official assurances for the Project. These monies were spent directly in

the face of an ordinance prohibiting such developments. This evidence and the reasonable inferences arising therefrom, show that the Developers were acting recklessly and in bad faith.

Obviously, the foregoing statement was made in reference to the Developers' answer to question 2(a) of plaintiffs' interrogatories to the Developers quoted below:

2. a. Prior to September 21, 1977, did defendants VP and/or ATV expend monies on the purchase of property, leasing of property or equipment, planning, design, construction and/or financing of the proposed construction of a condominium highrise on Tax Map Parcel 2-4-13:19?

Yes.

b. If so, please state the dollar amount of each expenditure made for each of the categories in 2(a) above.

| | |
|---|---|
| Purchase | $ -0- |
| Leasing of Property | 129,771.01 |
| Planning | 114,649.65 |
| Design | 39,555.01 |
| Construction | -0- |
| Financing | 2,370.00 |
| Sales of Units | -0- |
| Total: | $286,345.67 |

Because the expenditures mentioned above were made before the Developers "received any assurances for the Project," they do not count in the establishment of equitable estoppel, and the question of the Developers' good faith or bad faith in incurring those expenditures is immaterial and irrelevant in this case.

Be that as it may, we may state that the appeal record shows that, contrary to plaintiffs' assertions, the Developers acted in good faith throughout the controversy.

In that connection, the following statement of Chairman Bornhorst in her letter to Ing written on November 21, 1977, eleven days after the City Council action of November 10, 1977, is pertinent:

I sincerely hope that the final conclusion of this whole matter is not too hard on you economically. I think you

456

and Mr. Stark have shown a very gentlemanly manner, one which I think is a good example to other developers, as we go through this critical period of reassessing how our city is to grow.

Chairman Bornhorst had voted in the negative in the September 21, 1977, action of the City Council.

Also, the Church had as much at stake in the project as the Developers. At the City Council meeting of November 10, 1977, City Councilman Loo stated as follows regarding the role of the Church in the settlement of the controversy:

I'd like to commend everyone who worked toward the compromise, but I think the people that should be signaled out to a certain extent is the Methodist Church. Here they had the vote of the majority of the council members to go ahead with their 350 foot structure, however, they did decide that they should cut it down and my understanding is that they cut it down quite a bit to, now below 300 feet except for a little part of the structure which will be over 309 feet. Now, Madam Chairman, it is always difficult for a religious organization to have place, they need money just as any other organization to carry on their work, and they had educational, religious activities that they have planned and most probably will have to curtail some of those activities because of the sacrifice that they are making now. But I think that, to myself, since I did pose to them to search their conscience to make a compromise, I think I would say to them that as the Bible teaches "For what shall it profit a man if he shall gain the whole world and loses his own soul." And I would say to them that in my eyes, anyways, that they have retained their soul and that they have gained the respect of the community by this sacrifice.

Additionally, with regard to the Church, the editorial in the March 7, 1975, issue of the Honolulu Advertiser, referred to in Option (4) of Resolution No. 512, may be quoted:

The compromise reducing the size of the controversial church-sponsored condominium being planned for across from Thomas Square seems reasonable when compared with the monster that might have been.

The informal agreement between the First United Methodist Church and the Honolulu Academy Arts is the product of long discussion.

It should allow the Church to make adequate profit to face necessary costs as it seeks to protect the square and the academy from dominating development.

In a sense, we are fortunate the proposed massive development initially 42 stories up 350 feet; now 31 stories up 266 feet, and with the added grace of a significant 70-foot setback from Victoria Street involves a *church responsive to public outcry and willing to compromise as a social reply*. (Emphasis supplied).

That editorial was mentioned in Resolution No. 512, as being attached thereto, but it is not attached to the copy of Resolution No. 512 in the appeal record. However, inasmuch as the editorial was mentioned in the record and it is readily available, we take judicial notice of the same as being a matter of verifiable certainty. *Fringer v. Venema*, 26 Wis. 2d 366, 132 N.W.2d 565 (1965); Charles T. McCormick, Judicial Notice, 5 Vanderbilt Law Review 296, 323 (1952).

In connection with the foregoing reference to the Honolulu Advertiser editorial of March 7, 1975, some comment may be made on Resolution No. 512.

Resolution No. 512, consisting of four options, summarized the discussions in the ad hoc committee formed under the leadership of City Councilman Kaapu, following the community criticism of the City Council action of September 21, 1977, on the Developers' application for variance or modification. The nature of the resolution appears in the following colloquy between City Councilman Kaapu and City Councilman Koga:

Kaapu: So if there's any question on the resolution, first. Scotty?

Koga: These options are generally those that were worked out between you with, under your leadership with the developer, the property owner and the community groups over the past several weeks.

Kaapu: Yes, all three elements were present. I would say that, well, there may be individual variations of parts.

Koga: But generally, this is the general, the general consensus. Of course, nobody will agree, even on this Council, to every final detail as set forth, but this is, as far as you know, the consensus of the group thinking.

Kaapu: Generally, I believe this is true.

Option (1), referred to in the resolution as the preferred option, and which Hanson called the basic option, involved a re-siting of the apartment building in the Admiral Thomas project further away from Victoria Street by using TMK parcels 2-4-13-9, 2-4-13-10 and 2-4-13-75.

Even before the adoption of Resolution No. 512, the City Council knew that there was a roadblock to the effectuation of that option because of the opposition of James Doo and Olive Doo, owners of TMK parcel 2-4-13-10, to the use of their land for re-siting purpose. City Councilman Kaapu stated at the Committee of the Whole meeting of November 10, 1977:

We have received, I think, all of you have seen in your offices and I brought here a copy, a letter from the Doo family (M-1032), Mr. James Doo, indicating that they prefer not to sell. So this has to be encountered and dealt with separately, but this is just to get the ball rolling.

The opposition of James Doo and Olive Doo to the use of their land was a feature article in the Honolulu Star-Bulletin of November 14, 1977, four days after the adoption of Resolution No. 512, under the title, "The House Caught in the Middle".

That opposition was made known by James Doo and Olive Doo to the Mayor in their letter dated January 25, 1978, in which they stated in reference to the four draft resolutions mentioned on page 407 of this opinion:

Pursuant to the City Council Report of the Committee of the Whole dated January 11, 1978, four draft resolutions concerning the abandonment of a portion of Victoria Street and subsequent condemnation of three adjoining parcels were referred to your administration for completion and comments.

These resolutions are allegedly based upon providing a site for the Honolulu Theatre for Youth. However, it has become apparent that the real motivation for the proposed takings is to facilitate the re-siting of the controversial Admiral Thomas condominium.

As homeowners subject to this blatant abuse of the condemnation process, we ask that your administration critically consider and reject these resolutions.

We have lived on the site of the proposed condemnation for over 50 years. We unequivocally protest and denounce the Council's efforts to compromise the Admiral Thomas situation at our expense.

Compromise in the face of the church, the Academy of Arts and the developers is perhaps expedient but not with the sacrifice of our rights as citizens and homeowners.

The Mayor answered that letter on February 13, 1978, as follows:

Thank you for your letter regarding the City Council draft resolutions which would affect your property.

I have looked into the situation and find that you are correct in your assumption that this is to facilitate a re-siting of the Admiral Thomas condominium. I am informed that the actions proposed by these resolutions are not in conformance with either the Detailed Land Use Map or Development Plan for your area. Therefore the resolutions are unrealistic.

It may put your minds at ease to know that the resolutions may be moot. I have seen no indication that the developer is interested in a site change. Therefore there will be no practical reason for adoption of the resolutions. In any event, please know that I will oppose any move to make the necessary Development Plan changes.

On February 8, 1978, the City Council abandoned its attempt to acquire by condemnation the three parcels involved in Option (1), pursuant to Committee of the Whole Report No. 37, which recommended that the draft resolutions be filed for the reason stated in Departmental Communication No. 206 of DLU that any action taken under those reso-

lutions would be questionable without amending the Development Plan and DLUM.

Despite the roadblock posed by James Doo and Olive Doo, the Developers and the Church negotiated with representatives of the Academy for the use of TMK parcel 2-4-13-75, owned by the Academy, but ran into an impasse. According to Ing, three meetings were held with Treble, representing the Academy. The difficulty in the negotiation was that the Church and the Developers were dealing with a party which had only recently invested approximately $500,000 in purchasing the land for its own use, had its own plan to develop the same by constructing a multi-story building thereon, and had absolutely no obligation to negotiate with the Developers and the Church.

Option (2) was based on the availability of all of the parcels of land involved in Option (1). The Developers and the Church did not consider Option (2) because one parcel was definitely not available by negotiation, and any meaningful consolidation of the remaining two parcels was rendered impossible by such unavailability.

With regard to Option (3), that option involved a consideration of any urban design policy, which might emerge for the Thomas Square area, in the design of the Developers' project if that could be done without loss to the interested parties. The urban design policy then under consideration limited the height of the building on the project site to an average of 12 stories, compared to 30 stories in the building approved by the City Council action of November 10, 1977. The Developers and the Church did not consider such urban design policy in the design of their project because that could not be done without loss to themselves.

Option (4) called for a consideration of the building described in the March 7, 1975, editorial of the Honolulu Advertiser as an additional alternative.

If the Developers had decided to build a structure mentioned in Option (4), plaintiffs could not have objected because both Hanson and Callan had approved all of the options in Resolution No. 512.

At the Committee of the Whole meeting of November 10, 1977, City Councilman Kaapu asked Hanson, the following question:

This resolution, as it is, if we had to vote yes or no on it, should we vote "yes" on it?

to which Hanson replied, "I would say vote yes."

Likewise, at the same committee meeting, Callan stated: "We are ready to accept the resolution as it reads."

The building mentioned in Option (4) was 266 feet high, only 34 feet less in height than the height of the building approved in the City Council action of November 10, 1977. However, there was a greater setback in the plan approved on November 10, 1977, and it was Ing's thought that the additional setback would provide a better separation between the Academy and the Admiral Thomas.

Thus, with the approval of all of the options in Resolution No. 512 by Hanson and Callan, the controversy between plaintiffs on one side, and the Church and the Developers on the other, had narrowed down to a difference between a building of an average height of 300 feet versus a building 266 feet high, counterbalanced by a setback of 95 feet from Victoria Street in one case and a setback of 50 feet or 70 feet from Victoria Street in the other case.[17]

With regard to plaintiffs' argument that the Developers admitted bad faith by moving for summary judgment on the issue, it is not merely difficult, but is absolutely impossible to fathom their thinking. The filing of a motion for summary judgment is a procedure provided in the Hawaii Rules of Civil Procedure, in the interest of judicial economy, to secure just, speedy, and inexpensive determination of every action. As a matter of fact, in this case, plaintiffs resorted to a motion for summary judgment before the Developers did.

In concluding this opinion, the statement of the late Robert Maynard Hutchins in one of his lectures that "Utopia

---

[17] According to Ing's statement the setback of the 266 feet high building was 50 feet; according to the Honolulu Advertiser editorial, the setback was 70 feet.

thrives on controversy" is apposite. Hutchins was chairman and director of the Center for the Study of Democratic Institutions at the time of his death, had previously served as chancellor of the University of Chicago and dean of Yale Law School, and was a controversial figure himself.

As a result of the controversy, the building which could have been 350 feet high, containing 275 apartments occupying 309,476 square feet of floor area, ended up with a building of an average height of 299 feet, containing 150 apartments occupying 178,416 square feet of floor area.[18]

In a controversy such as this, which involves amorphous concepts such as historical, cultural, and scenic values, the issues are neither all white nor all black, and they could have been resolved only by accommodation, not in the cynical sense of the statement of Artemus Ward, "My pollertics, like my religion, being of an exceedin' accommodatin' character," but in the sense of accommodation by the willingness of the Church and the Developers, who had direct financial stakes in the project, to respond not only to the concern of the Academy but to the concern of the public sector, and by the effort of nine conscientious elected representatives of the people to find a viable middle ground in the public interest. Among those elected representatives of the people is included City Councilman Clement, as to whose negative votes in the November 10, 1977, actions, Chairman Bornhorst said, "I respect your feelings."

The outcome of the controversy left the Developers with 131,060 square feet of floor area less to sell, and the Church with 131,060 square feet of floor area less to lease and derive income to carry on its activities.

The Developers and the Church took such reduction voluntarily, albeit in response to the concerns of the Academy and the public sector.

---

[18] The floor area of 178,416 square feet is calculated as follows: The floor area of the building approved on September 21, 1977, was 208,152 square feet. Floor area of each floor was 5,947.20 square feet. Reduction of five floors would have reduced the floor area by 29,736 square feet.

In the circumstance, we cannot say that the Developers and the Church acted in bad faith in any manner in connection with the Admiral Thomas project.

Also the City Council was justified in determining that the plan it approved was consistent with the spirit of the amendments to CZC, General Plan, DLUM, and Development Plan, and with the health, safety, morals, and general welfare of the City and County of Honolulu.

Affirmed.

*Fred Paul Benco (Walter P. Zulkoski* and *Paul McCarthy* with him on the briefs) for Plaintiffs-Appellants.

*Joseph T. Kiefer* and *William E. Atwater (Carlsmith, Carlsmith, Wichman & Case* of counsel) for Defendants-Intervenors-Appellees.

*Ronald B. Mun,* Deputy Corporation Counsel, City and County of Honolulu, for Defendants-Appellees.

*Susan M. Ichinose* and *Warren Y. Kunimoto (Mukai, Ichiki, Raffetto & Macmillan* of counsel) for Intervening Defendant-Appellee, First United Methodist Church.

# EXHIBIT I

# EXHIBIT II

**North**
KAKAAKO
INTERIM DEVELOPMENT
CONTROL MAP

EXISTING ZONING

LEGEND:

————— Ordinance No. 4551 (Kakaako) Area

——— Ordinance No. 78-18 HCS District 5 Area

– – – – Ordinance No. 78-64 (Revised Kakaako) Area

I Project Site
II Honolulu Academy of Arts
III · Thomas Square

# EXHIBIT III

elevation (beretania st.)

admiral thomas

LEGEND:

I Honolulu Academy of Arts
II Victoria Street
III Existing sanctuary
IV Proposed apartment building
V Existing apartment building
VI Existing apartment building
VII Existing apartment building

EXHIBIT IV

Proposed Thomas Square
Height Envelope

PROPOSED APT STRUCTURE
(A-4 ZONING DISTRICT)

350'

121'

95'

Victoria
Street

ACADEMY OF ARTS

Ward
Avenue

# EXHIBIT V

## CZC CUMULATIVE SUPPLEMENT
### JANUARY 1, 1970, THROUGH DECEMBER 31, 1977
### PUBLISHED PURSUANT TO HRS §46-2.2

## ORDINANCES REGULATING ISSUANCE OF BUILDING PERMITS DURING INTERIM PERIODS

| | Ordinance number | Effective date | Original expiration date | Extended expiration date |
|------|------------------|----------------|--------------------------|--------------------------|
| (1) | 4362 Waikiki | 9-25-74 | 12-31-74 | 3-31-76 |
| (2) | 4436 Punchbowl (First) | 3-18-75 | 8-4-75 | |
| (3) | 4455 Diamond Head | 5-27-75 | 12-31-75 | |
| (4) | 4551 Kakaako | 1-23-76 | 11-28-76 | 6-30-79 |
| (5) | 4590 Punchbowl (Second) | 5-20-76 | 2-19-77 | 5-21-78 |
| (6) | 4591 Upper Manoa | 5-26-76 | 9-30-76 | 6-30-77 |
| (7) | 4602 Chinatown | 6-23-76 | 12-22-76 | |
| (8) | 4655 Kaneohe | 12-21-76 | 12-31-77 | 6-30-79 |
| (9) | 4656 Kailua | 12-2-76 | 12-31-77 | 6-30-79 |

| | Ordinance number | Effective date | Original expiration date | Extended expiration date |
|---|---|---|---|---|
| (10) | 77-84 Agricultural districts | 9-12-77 | 4-1-78 | |
| (11) | 77-103 Pohakupu | 10-19-77 | 6-30-78 | |

Ordinances extending expiration dates:

Waikiki Ordinance: Ordinance Nos. 4402, 4469, 4497, 4534

Kakaako Ordinance: Ordinance Nos. 4654, 77-51, 77-113

Second Punchbowl Ordinance: Ordinance Nos. 77-6, 77-50, 77-112

Upper Manoa Ordinance: Ordinance Nos. 4633, 4668

Kaneohe Ordinance: Ordinance No. 77-102

Kailua Ordinance: Ordinance No. 77-101